[Crim. No. 21313. Oct. 20, 1980.]

In re JEANICE D., a Minor, on Habeas Corpus.

COUNSEL

Quin Denvir, State Public Defender, and Mark E. Cutler, Deputy State Public Defender, for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally, Roger E. Venturi, Anthony L. Dicce, Willard F. Jones and Ramon M. de la Guardia, Deputy Attorneys General, for Respondent.

OPINION

**TOBRINER, J.**—In this proceeding, petitioner Jeanice D., a minor, seeks a writ of habeas corpus, contending that the superior court exceeded its jurisdiction in sentencing her to state prison without first remanding her to the California Youth Authority (CYA) for evaluation pursuant to section 707.2 of the Welfare and Institutions Code.[1] In defense of the trial court's action, the Attorney General argues that because of her conviction of first degree murder without special circumstances, Jeanice is statutorily ineligible for commitment to the CYA under section 1731.5. The Attorney General maintains that in view of such alleged ineligibility, the trial court was under no obligation to remand her for an evaluation report under section 707.2.

For the reasons discussed below, we have concluded that Jeanice is entitled to the relief she seeks. Contrary to the main premise of the At-

---

[1]Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

torney General's argument, we find that Jeanice's conviction does not render her automatically ineligible for CYA commitment. As we shall explain, pursuant to the current provisions of Penal Code section 190, Jeanice's conviction of first degree murder without special circumstances carries a "25 years to life" sentence; moreover, for more than 35 years, we have followed this court's decision in *People* v. *Ralph* (1944) 24 Cal.2d 575 [150 P.2d 401] that a minor facing such an indeterminate sentence is not ineligible for CYA commitment under section 1731.5.

The Attorney General attempts to avoid the force of the *Ralph* decision by arguing that the 25 years to life sentence of Penal Code section 190 should not be read as establishing an indeterminate sentence but should instead be construed as a determinate life sentence with a minimum parole eligibility date of 25 years. As we shall explain, however, the Attorney General's construction conflicts with the explicit language of the statute and finds no support in any relevant legislative history. Accordingly, we conclude that the requested writ should issue.

### 1. *Procedural background*

In May 1979, Jeanice, who was then 17 years of age, was tried as an adult in Merced County Superior Court and was convicted of (1) first degree murder without special circumstances and (2) use of a firearm in the commission of the murder. Prior to sentencing, defense counsel requested that the trial court remand Jeanice to CYA for a diagnostic evaluation and report pursuant to section 707.2.[2] The trial court, although indicating that in its view the 25 years to life sentence of Penal Code section 190 represented "an indeterminate sentence, not one of the determinate sentences that was enacted by the Legislature in 1977," nevertheless denied defense counsel's request, stating that "[m]y version of the law as it exists is I am not permitted nor do I care to commit you to the Youth Authority for their observation and diagnostic workup."

---

[2]Section 707.2 provides: "Prior to sentence, the court of criminal jurisdiction may remand the minor to the custody of the California Youth Authority for not to exceed 90 days for the purpose of evaluation and report concerning his amenability to training and treatment offered by the Youth Authority. *No minor who was under the age of 18 years when he committed any criminal offense* and who has been found not a fit and proper subject to be dealt with under the juvenile court law *shall be sentenced to the State prison unless he has first been remanded to the custody of the California Youth Authority for evaluation and report pursuant to this section* and the court finds after having read and considered the report submitted by the Youth Authority that the minor is not a suitable subject for commitment to the Youth Authority." (Italics added.)

Thereafter, the court directly committed Jeanice to state prison for 25 years to life, with a consecutive term of two years for use of a firearm.

In addition to appealing from the judgment of conviction, Jeanice filed the instant petition for a writ of habeas corpus in the Court of Appeal, asserting that the trial court had exceeded its jurisdiction in sentencing her to state prison without first obtaining a diagnostic report from the CYA and that her remedy by appeal did not afford an adequate, prompt remedy.[3] The Court of Appeal issued an order to show cause, and, after briefing and oral argument, ruled in favor of Jeanice. Thereafter, in light of the general importance of the question of statutory interpretation presented, we granted the Attorney General's petition for hearing.

In challenging the trial court's action, Jeanice contends (1) that the trial court was in error in considering her ineligible for CYA commitment, and (2) that, even if she is ineligible for such commitment, the court was nonetheless obligated under section 707.2 to remand her for a diagnostic evaluation and report. As we shall explain, we have concluded that Jeanice's conviction does not render her ineligible for CYA commitment and that for this reason alone the trial court's action cannot be sustained. In light of this conclusion, we have no occasion in the instant case to determine whether section 707.2 additionally requires a trial court to remand for a diagnostic evaluation those minors who come within section 707.2's literal terms but who are statutorily ineligible for CYA commitment. (See *People* v. *Eaker* (1980) 100 Cal.App.3d 1007, 1015-1016 [161 Cal.Rptr. 417]; *People* v. *Grisso* (1980) 104 Cal.App.3d 380, 385-386 [163 Cal.Rptr. 547].)

2. ■ *Because petitioner was convicted of an offense carrying an indeterminate sentence, she is eligible for CYA commitment pursuant to section 1731.5*

Section 1731.5 currently provides, as it has since 1941, that a person under 21 years of age who is convicted of a crime is generally eligible for commitment and treatment in the CYA unless, inter alia, he or she

[3]In this proceeding, the Attorney General has not contested petitioner's right to raise the present issue through a petition for writ of habeas corpus. (See, e.g., *Neal v. State of California* (1960) 55 Cal.2d 11, 16-17 [9 Cal.Rptr. 607, 357 P.2d 839]; *In re Duran* (1974) 38 Cal.App.3d 632, 635 [113 Cal.Rptr. 442].)

has been sentenced to "imprisonment for life."[4] Shortly after the enactment of section 1731.5, this court unanimously concluded in *People* v. *Ralph, supra*, 24 Cal.2d 575, that a youth who is convicted of an offense carrying an indeterminate sentence with a possible life imprisonment maximum (e.g., a sentence of "five years to life") does *not* fall within the "imprisonment for life" exclusion embodied in the statute, and thus, if amenable to treatment as a juvenile offender, may be committed to the CYA. In the more than 35 years since the decision in *Ralph*, the Legislature has amended section 1731.5 on many occasions but has never questioned the validity of the interpretation of the statute in *Ralph*.

In the present case, Jeanice has been convicted of first degree murder without special circumstances. Under Penal Code section 190, as amended by the voters of this state in November 1978, her offense carries a sentence of "25 years to life."[5] Noting that the statutory language prescribing this sentence cannot be distinguished from the statutory terminology that has uniformly been utilized in this state to signify an indeterminate sentence with a minimum possible term of 25 years and a maximum potential term of life imprisonment (see, e.g., *In re Lee* (1918) 177 Cal. 690 [171 P. 958]), Jeanice argues that under *People* v. *Ralph, supra*, 24 Cal.2d 575, the trial court erred in finding her ineligible for CYA commitment pursuant to section 1731.5.

---

[4]Section 1731.5 presently provides in relevant part: "After certification to the Governor as provided in this article a court may commit to the [California Youth] [A]uthority any person convicted of a public offense who comes within subdivisions (a), (b), and (c), or subdivisions (a), (b), and (d), below:
"(a)   Is found to be less than 21 years of age at the time of apprehension.
"(b)   Is not sentenced to death [or] imprisonment for life....
"(c)   Is not granted probation.
"(d)   Was granted probation and probation is revoked and terminated.    .
"The Youth Authority shall accept a person committed to it pursuant to this article if it believes that the person can be materially benefited by its reformatory and educational discipline, and if it has adequate facilities to provide such care."

[5]Penal Code section 190 currently provides in full: "*Every person guilty of murder in the first degree shall suffer* death, confinement in state prison for life without possibility of parole, or *confinement in the state prison for a term of 25 years to life.* The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5.    .
"Every person guilty of murder in the second degree shall suffer confinement in the state prison for a term of 15 years to life.
"The provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code shall apply to reduce any minimum term of 25 or 15 years in a state prison imposed pursuant to this section, but such person shall not otherwise be released on parole prior to such time." (Italics added.)

Although the trial court, in concluding that Jeanice was ineligible for CYA commitment, apparently was under the impression that the nature of Jeanice's offense (i.e., first degree murder) was itself controlling, the Attorney General properly recognizes that under section 1731.5 it is the nature of the sentence, rather than the offense, which governs a juvenile's eligibility for commitment to CYA. In light of the applicable statutory framework, the Attorney General implicitly acknowledges that if, as the trial court thought, the current provisions of Penal Code section 190 provide for an indeterminate 25 years to life sentence, it necessarily follows under the *Ralph* decision that Jeanice is eligible for CYA commitment. In seeking to forestall that result, however, the Attorney General argues that contrary to the trial court's reading, the "25 years to life" sentence currently provided by Penal Code section 190 should not be interpreted as establishing *an indeterminate sentence* in which the actual term of an individual's sentence may be set between 25 years and life, but rather should be read as prescribing *a determinate life sentence* in every case with a minimum parole release date of 25 years. A careful review of the explicit language of Penal Code section 190 (quoted in full at fn. 5, *ante*), however, demonstrates the fallacy of the Attorney General's proposed construction.

To begin with, the initial, and most obvious, indication of the nature of the sentence established by the statute flows from the "25 years to life" language utilized in the provision. As already noted, this statutory terminology is precisely the language that has been commonly and uniformly utilized in this state to denote an indeterminate sentence. ■ As this court observed nearly a half-century ago: "It is a well-recognized rule of construction that after the courts have construed the meaning of any particular word, or expression, and the legislature subsequently undertakes to use these exact words in the same connection, the presumption is almost irresistible that it used them in the precise and technical sense which had been placed upon them by the courts." (*City of Long Beach* v. *Payne* (1935) 3 Cal.2d 184, 191 [44 P.2d 305].)

This prime principle, moreover, applies equally to subsequent legislation adopted through the initiative process as to enactments passed by the Legislature itself. (See, e.g., *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 93 [207 P.2d 47].) ■ If the drafters of the current version of Penal Code section 190 had intended to establish a determinate life sentence, with some minimum parole fixing date, they surely would not have specifically utilized language that unequivocably connotes an indeterminate sentence.

Furthermore, even if the "25 years to life" language left any question as to the nature of the sentence established by the section, any such doubt dissolves in the concluding sentence of Penal Code section 190. That sentence provides in relevant part: "The provisions of Article 2.5 (commencing with section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code [relating to credit, i.e., reduction in time of confinement, for good behavior and participation in designated programs] shall apply to reduce *any minimum term of 25 . . . years in a state prison imposed pursuant to this section,* but such person shall not otherwise be released on parole prior to such time." (Italics added.)

In referring to a "minimum term of 25 . . . years . . . imposed pursuant to this section," the current statute unambiguously demonstrates that the provision contemplates that an individual sentenced under the statute will *not* automatically receive a determinate term of life imprisonment. Instead, the statute recognizes that, as with traditional indeterminate sentences, the term actually *imposed* upon an individual offender may range from 25 years to life. The Attorney General's proposed interpretation of the statute as requiring an automatic imposition of a sentence of life imprisonment in every case completely conflicts with this language and for that reason alone must be rejected.

Finally, even if—despite the clarity of the statutory terminology—we were somehow able to discern a remaining ambiguity in the statute, the Attorney General's suggested interpretation of the provision still could not be sustained. ▮ It is, of course, an established principle that ambiguities in penal statutes must be construed in favor of the offender, not the prosecution. "'When language which is reasonably susceptible of two constructions is used in a penal law, ordinarily that construction which is more favorable to the offender will be adopted.' [Citation.] The defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute." (*People* v. *Smith* (1955) 44 Cal.2d 77, 79 [279 P.2d 33]; see, e.g., *People* v. *Superior Court (Douglass)* (1979) 24 Cal.3d 428, 435 [155 Cal.Rptr. 704, 595 P.2d 139].) ▮ The Attorney General's interpretation would turn this principle on its head.

In attempting to defend his proposed interpretation of Penal Code section 190, the Attorney General points out that prior to the November 1978 amendment of the statute minors convicted of first degree murder without special circumstances were not eligible for CYA commitment. (See, e.g., *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698,

724-725 [135 Cal.Rptr. 392, 557 P.2d 976].) The Attorney General argues that because there is no indication that the drafters of the amendment specifically intended to render such minors eligible for CYA commitment, the section should not be given such effect. The prior ineligibility for CYA of minors convicted of first degree murder, however, flowed simply from the fact that before 1978, Penal Code section 190 prescribed a "straight" life imprisonment sentence for the offense.[6] As we have explained, under section 1731.5, the alteration of this sentence in November 1978 carried with it an alteration in a minor offender's CYA eligibility. Although there may be no affirmative indication that the drafters of the provision specifically had this consequence in mind, by the same token there is similarly no indication that the drafters intended to preclude the normal application of section 1731.5.

Moreover, if, as the Attorney General urges, we were to interpret Penal Code section 190's "25 years to life" sentence for first degree murder as establishing a determinate life sentence, rendering a minor ineligible for CYA commitment, it would follow that a separate provision of Penal Code section 190, prescribing a "15 years to life" sentence for *second* degree murder (see fn. 5, *ante*) would likewise necessarily be construed as creating a determinate life sentence, thereby rendering all minors convicted of second degree murder similarly ineligible for CYA commitment. From the enactment of section 1731.5 in 1941, however, juveniles convicted of second degree murder have at all times been eligible for CYA commitment. We do not have the slightest indication that the 1978 amendment sought to curtail that eligibility.[7] Consequently, contrary to the Attorney General's suggestion, the present case cannot be resolved by resorting to the treatment of juveniles under earlier versions of Penal Code section 190. Rather, the present provisions of Penal Code section 190, analyzed above, must control.

---

[6]Prior to amendment in the November 1978 election, Penal Code section 190 provided in part: "Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement *in state prison for life*." (Italics added.) The italicized language reflected the sentence for first degree murder without special circumstances.

[7]Prior to 1976, persons convicted of second degree murder under Penal Code section 190 faced a "five years to life" sentence (see Stats. 1927, ch. 889, § 1, p. 1952; Stats. 1957, ch. 1968, § 1, p. 3509; Stats. 1973, ch. 719, § 1, pp. 1297-1298), and at that time juveniles convicted of second degree murder were uniformly considered eligible for CYA commitment under *Ralph*. With the enactment of the Uniform Determinate Sentencing Act of 1976 (DSL), the sentence for second degree murder was revised to "five, six or seven years" (Stats. 1976, ch. 1139, § 133, p. 5098), but juveniles found guilty of

The Attorney General further argues that our reading of the "25 years to life" provision of section 190 as establishing an indeterminate, rather than determinate, sentence conflicts with one of the purposes of the 1978 amendment expressed in the election pamphlet argument, namely, the objective of increasing the penalties for first (and second) degree murder. Contrary to the Attorney General's assertions, however, our interpretation of the statute does not impede this purpose, because the adoption of indeterminate sentences with respective minimum terms of 25 years and 15 years and a potential maximum of life imprisonment itself represents a significant increase over the prior penalties for both first and second degree murder.

Prior to the 1978 amendment, a person convicted of first degree murder without special circumstances and sentenced to a straight life term, was eligible for parole in seven years. (See Pen. Code, § 3046.)[8] Under the indeterminate 25 years to life sentence of current Penal Code section 190, by contrast, the earliest that such an offender may be released from prison on parole, even if his term is set at the minimum 25-year period, would be 16 years and 8 months, an obvious increase in confinement over the prior 7-year period. Similarly, the 1978 amendment of Penal Code section 190 altered the punishment for second degree murder from "5, 6 or 7 years" to an indeterminate term of "15 years to life," a clear increase in penalty. Consequently, in interpreting the new provisions of Penal Code section 190 as creating indeterminate 15 and 25 years to life sentences, we do not contravene the initiative's purpose of increasing the punishment for first and second degree murder.[9]

---

the offense remained eligible for CYA commitment under section 1731.5.

Although the November 1978 amendment of Penal Code section 190 increased the minimum term for second degree murder from five to fifteen years, the current statute explicitly prescribes a sentence precisely analogous to the "five years to life" term for second degree murder which existed for many years prior to the DSL under which juveniles were clearly eligible for the CYA. Thus, a draftsman who intended to establish a 15 years to life indeterminate term for second degree murder, under which juveniles would remain eligible for CYA pursuant to section 1731.5, would have written the amendment of Penal Code section 190 in precisely the language in which the section now appears.

[8]Penal Code section 3046 provides in relevant part: "No prisoner imprisoned under a life sentence may be paroled until he has served at least seven calendar years."

[9]It might be argued that the replacement of the former straight life sentence for first degree murder with an indeterminate 25 years to life sentence would represent a reduction in penalty because under an indeterminate scheme an offender's actual sentence may in some cases be set at less than life imprisonment. In light of the actual operation of the pre-1978 provisions, however, this aspect of the "25 years to life" indeterminate sentence does not in reality represent any reduction from the actual sentence prescribed

Finally, although the 1978 election brochure arguments and analysis do disclose an intent to increase the punishment for first and second degree murder, neither the arguments nor analysis support the Attorney General's further suggestion that either the drafters of the measure or the electors who voted the proposition into law intended, notwithstanding the clear language utilized by the section, to establish determinate rather than indeterminate sentences.[10] The 1978 initiative, of course, was not drafted as part of the general DSL, but on the contrary, explicitly replaced the determinate sentence (five, six, or seven years) established by the DSL for second degree murder with a "15 years to life" sentence. (See fn. 7, *ante.*) Under these circumstances, we find no justification for interpreting the statute as establishing determinate sentences.[11]

---

by the prior law.

Under the prior statutory scheme, although Penal Code section 190 prescribed a straight life term, the Board of Prison Terms could effectively establish an ultimate sentence for life prisoners at less than 25 years. As already noted, under Penal Code section 3046 the board was authorized to release a life prisoner on parole after seven years; Penal Code section 3000, subdivisions (b) and (d), in turn, provided that such life prisoners would be completely discharged from custody upon their successful completion of a five-year period of parole. As a consequence of these statutory provisions, a life prisoner's ultimate sentence under the pre-1978 law could be considerably shorter than is possible under the present 25 years to life indeterminate sentence.

[10]The analysis of the initiative measure prepared by the Legislative Analyst contains no discussion of whether the "25 years to life" and "15 years to life" sentences embodied in the measure constitute indeterminate or determinate sentences. The one paragraph of the analysis that does describe these statutory sentences is totally ambiguous on the point. That paragraph reads in full: "The measure provides that individuals convicted of first degree murder and sentenced to life imprisonment shall serve a minimum of 25 years, less whatever credit for good behavior they have earned, before they can be eligible for parole. Accordingly, anyone sentenced to life imprisonment would be required to serve at least 16 years and 8 months. The penalty for second degree murder would be increased to 15 years to life imprisonment. A person sentenced to 15 years would be compelled to serve at least 10 years before becoming eligible for parole." (Ballot Pamp., Analysis by Legislative Analyst of Prop. 7, Gen. Elec. (Nov. 7, 1978) p. 32.)

While the initial portion of the paragraph dealing with the "25 years to life" sentence could in isolation be read to support the Attorney General's interpretation, the latter segment of the paragraph clearly indicates that the "15 years to life" sentence is not a determinate life sentence; if it were, of course, a person could not be "sentenced to 15 years" under the statute. The confusion of this paragraph simply indicates that the Legislative Analyst did not specifically address himself to the question of the nature of the sentences prescribed by the section.

[11]In enacting the DSL, the Legislature did not provide determinate sentences for all penal provisions in this state. Thus, for example, a variety of penal statutes currently provide for punishment "by imprisonment...in a state prison *not exceeding one year and one day....*" (Italics added.) (See Pen. Code, §§ 270 (failure to provide family support); 502.7 (telephone fraud); 594 (vandalism); 597.5 (fighting dogs); 653h (transfer of recorded sounds for unlawful use); 4532 (nonforcible escape from county jail).)

In sum, we conclude that Jeanice's sentence under Penal Code section 190 constitutes an indeterminate 25 years to life sentence. Therefore, under *People* v. *Ralph, supra*, 24 Cal.2d 575, she is eligible for CYA commitment pursuant to section 1731.5. Accordingly, the trial court erred in refusing to remand the matter to the CYA for a diagnostic evaluation and report prior to sentencing, as provided by section 707.2.

To avoid any misunderstanding, we note in conclusion that our holding in the present case in no sense mandates or guarantees that Jeanice will ultimately be committed to the CYA rather than to state prison. Instead, our decision simply recognizes that the existing statutes adopted by the Legislature and the voters of this state preserve to the sentencing court an *option* of such commitment and treatment in the event that the court finds such commitment appropriate in light of the minor's individual circumstances.

In this respect, the Attorney General's proposed interpretation of the statute in question would not only fly in the face of the provision's clear language, but would also run counter to "[t]he basic predicate of the Juvenile Court Law...that each juvenile be treated as an individual." (*In re William M.* (1970) 3 Cal.3d 16, 31 [89 Cal.Rptr. 33, 473 P.2d 737].) Any contrary interpretation of the statute would strip the court of its opportunity to judge and determine the treatment of this individual juvenile. Moreover, the Attorney General's interpretation would disregard the legislative directive that provisions of the juvenile law are to be "liberally construed" to promote the goal of "substituting for retributive punishment methods of training and treatment directed toward the correction and rehabilitation of young persons found guilty of public offenses." (§ 1700.)

Let the writ of habeas corpus issue. The trial court is directed to recall petitioner from state prison, to refer her to the CYA for evaluation and report, and thereafter to determine the appropriate disposition of the case pursuant to the provisions of section 707.2.

Bird, C. J., Mosk, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent.

The Youth Authority Act (Welf. & Inst. Code, § 1731.5, subd. (b)) for some time has provided that those persons who are sentenced to

death or "imprisonment for life" are ineligible for commitment to the Department of the Youth Authority (YA). Accordingly, felons who were sentenced to life imprisonment for first degree murder under former section 190 of the Penal Code (all further statutory references are to that code unless otherwise cited) could not be committed to the YA. (See *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 724-725 [135 Cal. Rptr. 392, 557 P.2d 976].) Former section 190 was repealed by the adoption of an initiative measure (Prop. 7 on Nov. 7, 1978, ballot) and revised section 190 was enacted. As an alternative punishment for first degree murder the new section provides for a term of "25 years to life."

The issue in the case is thereby framed: Are those felons who are presently sentenced to "25 years to life" following a first degree murder conviction ineligible for YA commitment because they are to be deemed imprisoned "for life" within the meaning of section 1731.5, subdivision (a), of the Welfare and Institutions Code? In my view they are, based upon both the context of the statutory scheme existing at the time new section 190 was approved and also on the probable intent of the authors of Proposition 7 and of the people who so recently adopted it.

I. STATUTORY FRAMEWORK

A brief review of the several applicable statutory provisions which governed sentencing procedures before the adoption of the 1978 initiative measure may aid in understanding both the intent and effect of new section 190.

a.) *The Indeterminate Sentence Law.* Prior to July 1, 1977, sentencing courts were guided by the provisions of the Indeterminate Sentence Law (ISL) which specified that "the court in imposing the sentence shall not fix the term or duration of imprisonment." (Former § 1168.) Any felony sentence with a specified minimum term, and either a life maximum or no specified maximum, was deemed an "indeterminate term" with a maximum of life. (§ 671; *In re Quinn* (1945) 25 Cal.2d 799, 800-804 [154 P.2d 875].) A sentence to an indeterminate term was, in effect, deemed a sentence for the maximum statutory term, subject to parole by the Adult Authority (former § 3020), which agency was constitutionally compelled to fix a term within the statutory range that was proportionate to the offense. (*In re Rodriguez* (1975) 14 Cal. 3d 639 [122 Cal.Rptr. 552, 537 P.2d 384].)

In commenting on the ISL, we explained that its purpose was to moderate the punishment imposed upon an offender, with emphasis upon reformation by making the punishment fit the criminal rather than the crime. (*In re Minnis* (1972) 7 Cal.3d 639, 644 [102 Cal.Rptr. 749, 498 P.2d 997].) Terms were not fixed according to a formula of punishment, but in accordance with the perceived adjustment and social rehabilitation of the individual offender. (*Ibid.*)

One exception to the indeterminate term concept was the express life term when imposed for first degree murder under former section 190. Such a term was *not* deemed an indeterminate term. (*In re McManus* (1954) 123 Cal.App.2d 395 [266 P.2d 929].) The distinction between this life term and the indeterminate term with a maximum of life is illustrated by the language of former section 190 (as amended in 1957): "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison *for life*,...and every person guilty of murder in the second degree is punishable by imprisonment in the state prison *from five years to life*." (Italics added.) Additionally, former section 3046 provided that a person sentenced to life imprisonment under former section 190 could not be paroled "until he has served at least seven calendar years."

b.) *The Determinate Sentencing Law.* The determinate sentence law (DSL) effective July 1, 1977, amended section 1168 and repealed the provisions governing the fixing of terms by the Adult Authority (former § 3020), substituting "determinate terms" for substantially all offenses which formerly had carried indeterminate terms and which had not been reduced to misdemeanors.

A "determinate term" is one with a range of three different terms of years, designated the "upper," "middle" and "lower" term to which the court may sentence a defendant convicted of a felony. (See § 1170.) The DSL made *no change* in the life term for first degree murder, but created a determinate term for second degree murder of five, six or seven years. (Former § 190, as amended in 1977.) At the time the DSL became operative, the Community Release Board (now the Board of Prison Terms) succeeded to the powers of the Adult Authority and thus could grant parole to a person serving a life term for murder once the requisite minimum term had been served. (The seven-year minimum of section 3046 was not altered by the DSL although the section was amended in respects not pertinent here.)

The intent of the Legislature in enacting the DSL differs substantially from the rationale underlying the ISL as expressed in *Minnis.* Section 1170, subdivision (a) (1), now recites that: "The Legislature finds and declares that the purpose of imprisonment for crime is punishment. This purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances. The Legislature further finds and declares that the elimination of disparity and the provision of uniformity of sentences can best be achieved by determinate sentences fixed by statute in proportion to the seriousness of the offense as determined by the Legislature to be imposed by the court with specified discretion." Section 1170 thus reflects a marked change in the purpose of California's sentencing laws.

c.) *The Youth Authority Act.* The Youth Authority Act (Welf. & Inst. Code, § 1700 et seq., enacted in 1941) controls the confinement and treatment of youthful offenders. Section 1700 recites that the purpose of the act is "to protect society more effectively by substituting for retributive punishment methods of training and treatment directed toward the correction and rehabilitation of young persons found guilty of public offenses." Not all youthful offenders, however, are eligible for YA commitment. As previously noted, Welfare and Institutions Code section 1731.5, reflecting the clear legislative recognition of the gravity of the offenses, precludes such commitment for otherwise eligible persons when the offender has been sentenced to death or "imprisonment for life." Such a youthful offender is legislatively determined to be not amenable to the intensive rehabilitative treatment afforded by the YA. For all other youthful offenders, a commitment to the YA is within the broad discretion of the trial court. (See *id.,* §§ 1700, 1731.5; see also *In re Clarence B.* (1974) 37 Cal.App.3d 676, 682 [112 Cal.Rptr. 474].)

To insure that the benefits of YA commitment are made available to the qualified 16- or 17-year-old offender, Welfare and Institutions Code section 707.2 mandates that a person convicted as an adult for an offense committed while he was under 18 years of age shall not be sentenced to "state prison unless he has first been remanded to the custody of the California Youth Authority for evaluation and report...and the court finds after having read and considered the report...that the minor is not a suitable subject for commitment to the Youth Authority."

d.) *The 1978 Initiative.* In the foregoing statutory context, the voters on November 7, 1978, approved a measure which repealed former section 190 and enacted new section 190 which now provides in pertinent part: "Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or *confinement in the state prison for a term of 25 years to life*. . . .

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"The [good behavior credit] provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code shall apply to reduce *any minimum term of 25* . . . *years* . . . imposed pursuant to this section, but such person shall not otherwise be released on parole prior to such time." (Italics added.)

Section 190 thus no longer provides that the person imprisoned for first degree murder will be confined "in the state prison for life," subject to separate limitations on parole release provided in section 3046, but rather creates penalties which, under the ISL, would have been deemed to be indeterminate terms.

Petitioner argues that the trial court erred in not obtaining the YA report contemplated by section 707.2 of the Welfare and Institutions Code prior to sentencing her to prison and relies on *People* v. *Ralph* (1944) 24 Cal.2d 575 [150 P.2d 401], to support her contention. In *Ralph*, three defendants were convicted of first degree *robbery*. The court denied their motions for certification to YA and sentenced them under the ISL to state prison for an indeterminate term of five years to life. After observing that the purpose of both the ISL and the Youth Authority Act was "reformation of the offender," we stated that the two laws "shall be construed and applied to work together as complementary parts of a more enlightened penal system." We therefore concluded that a term of five years to life was not "imprisonment for life" under Welfare and Institutions Code section 1731.5, subdivision (b), so as to bar a person so sentenced from YA consideration.

Although the expression "25 years to life" appearing in the recently adopted section 190 is similar to that which previously was used exclusively to designate indeterminate terms, and is roughly comparable to the "five years to life" sentence considered in *Ralph*, I suggest that the

persuasive force of *Ralph* is substantially diluted by several important factors. The reformatory purpose of the ISL noted by us in *Ralph* has now been wholly replaced by the penal purpose expressed in the DSL. With the adoption of the DSL, fixed terms were substituted for indeterminate terms. The extensive provisions (§§ 3020-3025) governing the setting and resetting of indeterminate terms were also repealed. Both the purpose and the mechanics of the ISL have been substantially altered by the new DSL provisions.

Because the interaction of new section 190 with section 1731.5, subdivision (b), of the Welfare and Institutions Code creates, at a minimum, an ambiguity it is appropriate that, seeking to reconcile those provisions, we scrutinize the probable intent of those who framed and adopted the new law.

## II. LEGISLATIVE INTENT

When resolving an ambiguous or unclear provision "we must rely on a cardinal principle of statutory construction: that absent 'a single meaning of the statute apparent on its face, we are required to give it an interpretation based upon the legislative intent with which it was passed.' [Citation.]" (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 256 [104 Cal.Rptr. 761, 502 P.2d 1049].)

There are well established principles employed in interpreting initiative measures. In construing such laws which amend the state Constitution, we recently observed that "constitutional and other enactments must receive a liberal, practical common-sense construction which will meet changed conditions and the growing needs of the people. [Citations.]...The literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. [Citations.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) Moreover, we have long recognized that the ballot summary and arguments and analysis presented to the electorate are of singular benefit in discerning the intent of the voters, and determining the meaning of uncertain language. (See *id.*, at pp. 245-246; *Carter* v. *Seaboard Finance Co.* (1949) 33 Cal.2d 564, 580-581 [203 P.2d 758]; *People* v. *Ottey* (1936) 5 Cal.2d 714, 723 [56 P.2d 193]; *In re Quinn* (1973) 35 Cal.App.3d 473, 483 [110 Cal.Rptr. 881].)

In the present case, voters before adopting new section 190 were informed by the legislative analyst's discussion of the measure that the proposal was designed both to *expand* the categories of first degree murder for which penalties of death or life imprisonment without parole may be imposed, and also to *increase* the minimum period which a person convicted of murder must serve in prison before being eligible for parole. The analysis, contained in the voters pamphlet for the November 7, 1978, general election, reviews the existing penalties for first degree murder and then concludes that "[t]his proposition would: (1) *increase the penalties* for first...degree murder,...[¶] [I]ndividuals convicted of first degree murder and sentenced to life imprisonment shall serve a minimum of 25 years, less whatever credit for good behavior they have earned, before they can be eligible for parole. Accordingly, anyone sentenced to life imprisonment would have to serve at least 16 years and eight months." (Italics added, Voters Pamp., Gen. Elec. (Nov. 7, 1978) p. 32.) In addition, the analysis told the electors that the measure would also "expand the list of special circumstances requiring a sentence of either death or life imprisonment without the possibility of parole" and "revise existing law relating to mitigating or aggravating circumstances." (Both *id.*)

The overall intent of the 1978 amendment to section 190 is unmistakably clear; it would *increase* the penalties for murder. There is nothing whatever in the text of the measure itself nor in its accompanying analysis which suggests that the ISL would be partially revived, or that new indeterminate life terms were thereby established for murder, or that existing sentences therefor would be moderated. To the contrary, the voters were told otherwise. It follows that the new sentence of "25 years to life" is analogous to other "life" sentences under the current DSL, except that section 190 now provides a *specific* and later minimum eligible parole date which prevails over the minimum 7-year period established under section 3046 for other "life" sentences. It is quite clear that nothing in the text of the amendment or the voters analysis discloses any intent either to alter or liberalize the YA ineligibility provisions of Welfare and Institutions Code section 1731.5.

With due deference to the majority, I suggest that support for its thesis rests largely on a mechanical application of *People* v. *Ralph, supra,* 24 Cal.2d 575. As previously noted, however, its rationale lacks any statutory underpinnings, because the ISL, under which the defendant in *Ralph* was sentenced, no longer exists; both the DSL and the measure

before us disclose a manifest intent to increase rather than decrease the penalties for the commission of murder.

Moreover, *Ralph* is factually distinguishable. There, the defendants were convicted of first degree *robbery*; here, petitioner's offense is first degree *murder*, a far more serious offense.

In short, the underlying assumptions of *Ralph* are inapplicable, and uncontrolling. In the absence of any indication of a contrary intent, we should conclude that no change in YA commitment standards was intended by the amendment to section 190, and that a person sentenced to "25 years to life" under the new statute is sentenced to "imprisonment for life" within the meaning of Welfare and Institutions Code section 1731.5, subdivision (b).

III.   NECESSITY FOR EVALUATION REPORT

As previously noted, Welfare and Institutions Code section 707.2 (hereafter, further statutory references are to this code) provides that a minor who committed a crime while under the age of 18 years may not be sentenced to state prison unless he has first been remanded to the YA for evaluation and report, and after consideration of the report, the trial court finds the minor unsuitable for YA commitment. Read literally, there is a seeming conflict between section 707.2 and the ineligibility provisions of section 1731.5, because section 707.2 contains no specific exemptions for persons who are ineligible for YA commitment.

Section 1731.5, originally enacted in 1941, has not been amended since 1969. (Stats. 1969, ch. 785, § 2.) Section 707.2, enacted in 1975, was amended into its present form in 1976. (Stats. 1976, ch. 1069, § 1, p. 4808.) Petitioner contends that section 1731.5 must be construed as impliedly repealed to the extent that it conflicts with the more recently amended section 707.2. (Cf. *In re Thierry S.* (1977) 19 Cal.3d 727 [139 Cal.Rptr. 708, 566 P.2d 610]; see also 2A Sutherland, Statutory Construction (4th ed. 1973) § 51.03.) The doctrine of implied repeal is not favored, however, and there exists a presumption against its operation. A subsequent statute must *irreconcilably* conflict with the provision under consideration in order to replace it by implied repeal. (*Ibid.*)

Can we fairly assume that the Legislature intended to reduce the punishment of juvenile offenders who are sentenced either to death or

imprisonment for life by permitting them to be committed to the YA? A careful examination of the history of section 707.2 indicates quite the contrary intent. As originally enacted in 1975, section 707.2 (applicable only to persons under the age of 18 at the time of their offense) provided that, generally, no such person could be sentenced to state prison. There were three specific exceptions to this rule mandating YA commitment, covering those defendants who were (1) deemed ineligible under section 1731.5; (2) found by the YA to be unamenable to YA treatment and returned to the court under section 1737.1; or (3) subject to continued incarceration pursuant to sections 1780-1783.

The 1976 amendment to section 707.2 restored a measure of discretion to the sentencing judge. Under that section, any defendant who was under the age of 18 at the time of his offense may now be sentenced to state prison if he has been remanded to the YA for evaluation and, after reading the diagnostic report, the judge finds the defendant unsuitable for YA commitment. It is clear that the 1976 amendment to section 707.2 effectively *increased* the potential punishment of youthful offenders by increasing the number of situations in which prison sentences were authorized. The legislative history of the 1976 amendment discloses no intention to alter the long standing determination (expressed in § 1731.5, subd. (b)) that youthful offenders who are sentenced to death or imprisonment for life are inappropriate candidates for YA commitment. Thus, section 1731.5 was not impliedly repealed by section 707.2.

Because of the foregoing conclusion, I would hold that youthful offenders who are excluded from YA commitment pursuant to section 1731.5 should not be remanded to the YA for report and evaluation prior to sentencing to state prison, because the recommendation could benefit neither the defendant nor the sentencing judge. We cannot assume that the Legislature would command the performance of a useless act (*Netwig v. Huntington Beach Union High Sch. Dist.* (1975) 52 Cal.App.3d 529, 532 [125 Cal.Rptr. 170]). Thus, the trial court in the present case did not err in failing to obtain a YA report prior to sentencing petitioner.

The bizarre result of the majority's interpretation is that a people's initiative obviously designed to *tighten* procedures and *increase* punishment will now permit, for the first time in the state's history to my knowledge, a person convicted as an adult of first degree murder to re-

ceive YA rather than prison treatment. Either the majority is wrong or the people in adopting Proposition 7 were sorely misadvised.

I would deny the writ of habeas corpus.

Clark, J., and Manuel, J., concurred.