[No. B072303. Second Dist., Div. Four. Apr. 7, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
GUILLERMO BUSTOS et al., Defendants and Appellants.

1748

**COUNSEL**

Anthony J. Dain and Dennis L. Cava, under appointments by the Court of Appeal, and J. Randall Jue for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

Tricia A. Bigelow and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## VOGEL (C. S.), J.—

### INTRODUCTION

On May 28, 1991, appellants Guillermo Bustos and Michael Loretto robbed and murdered Jacqueline Kirkham in a women's restroom on Zuma Beach in Malibu. Appellants were under age 18 at the time, but were tried as adults. Appellants waived jury trial and, in light of confessions by each implicating the other, were tried separately by the court.

As to Bustos, who personally stabbed the victim to death, the court found him guilty as charged of (1) first degree murder and of the special circumstances that the murder was committed while lying in wait (Pen. Code, § 190.2, subd. (a)(15))[1] and in the commission of robbery (§ 190.2, subd. (a)(17)(i)), (2) robbery, and (3) as to both offenses, personally using a deadly weapon (§ 12022, subd. (b)) and personally inflicting great bodily injury (§ 1203.075). The court sentenced Bustos to state prison for life without the possibility of parole (§ 190.5, subd. (b)), plus one year (§ 12022).

As to Loretto, the court found him guilty of (1) first degree murder with the special circumstance that the murder was in the commission of robbery (§ 190.2, subd. (a)(17)(i)), (2) robbery, and (3) as to both offenses, personally inflicting great bodily injury (§ 1203.075). The court found him not guilty of personally using a deadly weapon and of the special circumstance of lying in wait. The court sentenced Loretto to state prison for 25 years to life. (§ 190.5, subd. (b).)

On appeal, appellants raise several contentions, mostly relating to the sentences. We affirm the convictions and remand for resentencing, because the trial court erred in sentencing appellants to state prison without first obtaining a diagnostic study from the Youth Authority as required by Welfare and Institutions Code section 707.2. We reject the People's contention that section 190.5, enacted by Proposition 115, rendered appellants ineligible for commitment to the Youth Authority or rendered superfluous the study required by Welfare and Institutions Code section 707.2.

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

## FACTS

The evidence in the two trials is largely duplicative and undisputed below. We summarize the undisputed background circumstances and then relate the details of appellants' confessions.

Appellants and their friend Jason Alexander lived in the Santa Fe, New Mexico, area. To avoid apprehension for a burglary there in which they were involved together, the three fled New Mexico by taking a bus to Los Angeles. They quickly ran out of money and were unable to stay with Alexander's grandfather as they had hoped. They began sleeping nights in a restroom at Zuma Beach, and ate only twice in three days.

On May 28, 1991, they observed the victim arrive at the beach in her car, a red 1990 Nissan 240SX. They decided to rob her in order to take her car and drive it back home to New Mexico.

The victim was a 43-year-old woman in fit condition who liked to exercise and tan. After appellants observed her for several hours tanning on the beach, they saw her enter a women's restroom. Appellant Loretto entered the restroom to rob her. She resisted and screamed. Loretto struck her about the head and face, knocking her down. Bustos, who was outside, grabbed a six-inch knife which Alexander had brought with him, and entered the restroom. Bustos stabbed the victim twice, both wounds being fatal. One stab was to the chest, fracturing the sternum and perforating the heart and right lung. The second was to the left side, fracturing the left seventh rib and perforating the left lung and diaphragm.

Appellants took the victim's purse and drove away in her car with Alexander. A witness gave police the license number and a description of the suspects. Appellants pawned the victim's two gold rings in Laughlin, Nevada, threw away the purse, and threw away the knife. After appellants returned to Santa Fe with the stolen car, it was involved in an accident. Investigation by the New Mexico State Police, Sante Fe County Sheriff, and Los Angeles County Sheriff quickly led to appellants, who were taken into custody. Following appellants' confessions, the authorities recovered the pawned rings, the victim's purse, and the knife.

## Bustos's Confession

According to the two confessions by Bustos, Loretto planned the crime and contemplated the killing of the victim.[2] Loretto suggested that "we should just mug a bitch and take her fuckin' car." When Loretto saw Jacqueline Kirkham and her car, he suggested she be the victim. Bustos objected that if they stole the car they would be caught because the police would have the license number. Loretto responded by saying, "Well, we're just gonna have to kill the bitch." Loretto said, "I'll mug the bitch and I'll take her keys and everything, but you and Jason are gonna have to kill her." Bustos and Alexander laughed and said, "We ain't . . . killing nobody."

When the victim entered the restroom, Loretto said, "There it is. Let's do it." Bustos said "What are we gonna do?" Loretto said "I'm gonna mug the bitch and you guys do it." As Bustos and Alexander watched, Loretto followed the victim into the restroom. After about 20 seconds, the victim was screaming and Loretto was saying, "Hurry up, hurry up." Alexander pointed out the knife, a long-bladed Mexican knife with designs in the handle, which Alexander had brought along. Bustos grabbed the knife and ran in. Loretto was on the floor struggling with the victim and had his hands around her head. He told Bustos, "Do it, do it, do it." Bustos stabbed the victim twice, in the chest and side. Loretto grabbed the victim's purse and keys, and they fled in the car.

## Loretto's Confession

Loretto was aware of and had seen the knife which Alexander had brought. They were "using it for protection in case anything would happen because we were just country boys in the city." It was a hunting knife about six inches long with Aztec drawings on it.

They "needed to find a way to get back home to New Mexico from California, and we had no money, and we were hungry, and we needed to find a way back." The victim had a car, and "we just needed to get, find a way home, we had seen her and the beach was empty pretty much." "[T]he reason we selected her is because we knew which car she got out of."

When he saw her go into the restroom, Loretto followed. Bustos was outside, "getting ready to run in." Loretto hit her in the face, and she fell to the floor. Loretto took her purse and she screamed. Bustos ran in and stabbed her twice, once below the ribs and once in the chest, above the heart.

---

[2] The court and prosecutor recognized that Bustos's statements were not admissible against Loretto.

## SUFFICIENCY OF EVIDENCE AS TO LORETTO

### *Reckless Indifference to Human Life*

In light of the evidence and the trial court's findings, the record shows that the actual killer was Bustos, not Loretto. In order to support a finding of special circumstances murder, based on murder committed in the course of designated felonies, against an aider and abettor who is not the actual killer, the prosecution must show either that the aider and abettor had intent to kill (§ 190.2, subd. (c)) or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subd. (d).) Section 190.2, subdivision (d), provides: "Notwithstanding subdivision (c), every person not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a), which felony results in the death of some person or persons, who is found guilty of murder in the first degree therefor, shall suffer death or confinement in state prison for life without the possibility of parole, in any case in which a special circumstance enumerated in paragraph (17) of subdivision (a) of this section has been found to be true under Section 190.4."

Subdivision (d) was added by Proposition 115 in order to bring the death penalty statute into conformity with *Tison* v. *Arizona* (1987) 481 U.S. 137, 158 [95 L.Ed.2d 127, 144, 107 S.Ct. 1676.]. (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 298, fn. 16 [279 Cal.Rptr. 592, 807 P.2d 434].) *Tison* held that the death penalty may be imposed in a case of "major participation in the felony committed, combined with reckless indifference to human life." Put another way, *Tison* held "that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." (*Tison* v. *Arizona, supra,* 481 U.S. at pp. 157-158 [95 L.Ed.2d at p. 144.].)[3]

Here, the prosecution did not attempt to prove, in Loretto's separate trial, that Loretto had actual intent to kill. ▮▮ The People contended, and the

---

[3]In response to *People* v. *Purcell* (1993) 18 Cal.App.4th 65, 74 [22 Cal.Rptr.2d 242], which held that in a jury trial the phrase "reckless indifference to human life" should be defined in jury instructions, CALJIC No. 8.80.1 (1993 rev.) now provides that "A defendant acts with reckless indifference to human life when such defendant knew or was aware that [his] [her] acts involved an extreme likelihood that such acts could result in the death of an innocent human being." There is no issue of jury instructions in this case, because trial was by the court.

trial court found, that Loretto acted with reckless indifference to human life as required by section 190.2, subdivision (d). Loretto contends on appeal that the evidence is insufficient to support this finding.[4]

■ When the sufficiency of evidence is attacked, the appellate court must view the evidence in the light most favorable to the judgment, presuming the existence of every fact the trier of fact could reasonably deduce from the evidence. Even if the evidence might reasonably be reconciled with the defendant's innocence, the appellate court may not substitute its judgment for the trier's. The test on appeal is whether any rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110]; *People v. Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253].)
■ We conclude the trial court could reasonably find from the evidence that Loretto acted with awareness of an extreme likelihood the victim could be killed and with reckless indifference to that consequence.

Loretto admitted planning the robbery with Bustos and Alexander, in that "we needed to find a way to get back home" and "we selected her because we knew which car she got out of." Loretto admitted knowing about and having seen the knife, saying "we were using it for protection." Loretto admitted going into the restroom to rob the victim and that Bustos was outside, "getting ready to run in." Loretto admitted hitting the victim, whereupon she fell to the floor. He admitted it was a "couple of minutes" before Bustos ran in with the knife. The court could reasonably infer from Loretto's admissions and other evidence that Loretto was engaged in a struggle with a resisting victim. Loretto admitted she screamed; the scene inside the restroom indicated a struggle. Loretto stated that Bustos ran in, and Loretto saw Bustos stab the victim twice, below the ribs and in the chest. Loretto did not claim in his statement that he was surprised Bustos had the knife or surprised Bustos stabbed the victim. Loretto did not claim that he attempted to prevent Bustos from stabbing the victim. Loretto fled together with his accomplices and the robbery loot, leaving the victim to die. (See *Tison v. Arizona, supra,* 481 U.S. at p. 152 [95 L.Ed.2d at pp. 140-141] [Ricky Tison "participated fully in the kidnaping and robbery and watched the killings after which he chose to aid those whom he had placed in the

---

[4]This contention has little practical significance for Loretto in light of the fact that he was not sentenced to death or to life without the possibility of parole. Because of his youth and the exercise of the trial court's discretion pursuant to section 190.5, subdivision (b) (discussed *post*), Loretto received a sentence of 25 years to life, the same sentence to which he would be subject for first degree murder even if the special circumstance finding were stricken. (§ 190, subd. (a).) We nevertheless address the issue on the theory that if the evidence were truly insufficient as Loretto contends, he would be entitled to have the special circumstance stricken and be treated as an "ordinary" first degree murderer.

position to kill rather than their victims"].) The evidence supports the finding that Loretto was a major participant who acted with reckless indifference to human life.

*Great Bodily Injury*

■ Loretto next contends that the evidence is insufficient to support the finding against him under section 1203.075, subdivision (a)(1) and (a)(2), which prohibit probation for any person who, in the commission of murder or robbery, "with the intent to inflict the injury, personally inflicts great bodily injury." It was Bustos who inflicted the stab wounds; Loretto contends that the injuries Loretto inflicted were not sufficiently serious to constitute great bodily injury.

Loretto admitted striking the victim in the head, on the face, knocking her to the floor. The evidence reasonably implies he struggled with her on the floor. A broken fingernail, as well as broken earrings, was found on the floor. The autopsy report showed, in addition to the two fatal stab wounds, "II. Contusions—nose, left elbow and left thigh. III. Lacerations—left upper lip. IV. Abrasions—right elbow, left knee and anus."

Section 1203.075, subdivision (b)(3), adopts the definition of great bodily injury in section 12022.7. Section 12022.7, subdivision (d), defines great bodily injury as "a significant or substantial physical injury." This definition does not require that the victim suffer " 'permanent,' 'prolonged,' or 'protracted' disfigurement, impairment, or loss of bodily function." (*People* v. *Escobar* (1992) 3 Cal.4th 740, 750 [12 Cal.Rptr.2d 586, 837 P.2d 1100].) A finding that the victim suffered great bodily injury must be upheld on appeal if supported by substantial evidence, even if the circumstances could also be reconciled with a contrary finding. (*Ibid.*) In *People* v. *Sanchez* (1982) 131 Cal.App.3d 718, 733 [182 Cal.Rptr. 671], the court upheld a great bodily injury finding where the victim suffered multiple abrasions and lacerations, swelling and bruising. In *People* v. *Escobar, supra*, 3 Cal.4th at pages 744, 750, the court upheld the finding where the victim suffered multiple abrasions, asphalt burns, bruises, and temporary pain and limping. We cannot say as a matter of law that the multiple abrasions, lacerations, and contusions suffered by the victim in addition to the fatal stab wounds did not constitute significant or substantial physical injury.

### YOUTH AUTHORITY DIAGNOSTIC STUDY

Bustos was 16 years, 9 months old when he committed the crimes. Loretto was 17 years, 4 months old when he committed the crimes.

Welfare and Institutions Code section 707.2 provides: "Prior to sentence, the court of criminal jurisdiction may remand the minor to the custody of the Youth Authority for not to exceed 90 days for the purpose of evaluation and report concerning his amenability to training and treatment offered by the Youth Authority. *No minor who was under the age of 18 years when he committed any criminal off ense and who has been found not a fit and proper subject to be dealt with under the juvenile court law shall be sentenced to the state prison unless he has first been remanded to the custody of the Youth Authority for evaluation and report pursuant to this section.*" (Italics added.)

■ This statute imposes a mandatory duty on the trial court to obtain a Youth Authority diagnostic study *before* sentencing to state prison a person who was under the age of 18 at the time of the offense. The statute is clear and has long received authoritative construction. (*In re Jeanice D.* (1980) 28 Cal.3d 210, 212-213 [168 Cal.Rptr. 455, 617 P.2d 1087] [defendant facing imprisonment of 25 years to life is eligible for commitment to the Youth Authority; obtaining report is mandatory]; *People v. Black* (1982) 32 Cal.3d 1, 4 [184 Cal.Rptr. 454, 648 P.2d 104] [obtaining report is mandatory where defendant was under age 18 at time of the offense, even if defendant was over 18 at time of sentencing]; *People v. Marsh* (1984) 36 Cal.3d 134, 141-142 [202 Cal.Rptr. 92, 679 P.2d 1033] [obtaining report is mandatory even if defendant is ineligible for commitment to the Youth Authority, noting that in 1976, Welf. & Inst. Code, § 707.2 was amended to delete a reference to "those persons eligible for commitment" to the Youth Authority].) The trial court erred in sentencing Bustos to prison, for life without the possibility of parole, and Loretto to prison, for 25 years to life, without first obtaining a report from the Youth Authority. There is no merit to the People's contention, accepted by the trial court, that section 190.5, enacted by the voters as part of Proposition 115 in June 1990, rendered Welfare and Institutions Code section 707.2 superfluous or a nullity in the circumstances of this case.

Prior to Proposition 115, a person under the age of 18 at the commission of the offense could not be subjected to the death penalty or a sentence of life imprisonment without possibility of parole. (Former § 190.5, now subd. (a) thereof; *People v. Spears* (1983) 33 Cal.3d 279 [188 Cal.Rptr. 454, 655 P.2d 1289].) Proposition 115 made it possible for a person under the age of 18 but over the age of 16 at the commission of the offense to be charged with special circumstances murder and sentenced to imprisonment for life without the possibility of parole, *or, however,* in the trial court's discretion, for 25 years to life. (Ballot Pamp., analysis of Prop. 115 by the Legislative Analyst as presented to the voters, Primary Elec. (June 5, 1990).) Section 190.5, subdivision (b) provides: "The penalty for a defendant found guilty of

murder in the first degree, in any case in which one or more of the special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."[5]

Section 190.5 gives a trial court discretion to choose a sentence of 25 years to life rather than life without possibility of parole. It has long been the law that a statutory punishment of imprisonment for 25 years to life does not render a youth ineligible for commitment to the Youth Authority. The California Supreme Court has for many years consistently interpreted Welfare and Institutions Code section 1731.5[6] to permit commitment to the Youth Authority for a crime with a statutory punishment such as 25 years to life, as distinguished from a so-called "straight life" sentence. (*People* v. *Ralph* (1944) 24 Cal.2d 575, 580 [150 P.2d 401]; *In re Jeanice D., supra,* 28 Cal.3d 210, 212-221; see *People* v. *King* (1993) 5 Cal.4th 59, 68-69 [19 Cal.Rptr.2d 233, 851 P.2d 27] [as to persons under age 18 at the commission of the crime].)

*In re Jeanice D., supra,* 28 Cal.3d 210, is in point. There, the court held: "In this proceeding, petitioner Jeanice D., a minor, seeks a writ of habeas corpus, contending that the superior court exceeded its jurisdiction in sentencing her to state prison without first remanding her to the California Youth Authority (CYA) for evaluation pursuant to section 707.2 of the Welfare and Institutions Code. [Fn. omitted.] In defense of the trial court's action, the Attorney General argues that because of her conviction of first degree murder without special circumstances, Jeanice is statutorily ineligible for commitment to the CYA under section 1731.5. The Attorney General maintains that in view of such alleged ineligibility, the trial court was under

[5]Section 190.5, as enacted by Proposition 115, provides in full: "(a) Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person who is under the age of 18 at the time of the commission of the crime. The burden of proof as to the age of such person shall be upon the defendant.

"(b) The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life.

"(c) The trier of fact shall determine the existence of any special circumstance pursuant to the procedure set forth in Section 190.4."

[6]Welfare and Institutions Code section 1731.5, subdivision (a) provides in pertinent part: "[A] court may commit to the authority any person convicted of a public offense who . . . [¶] (1) Is found to be less than 21 years of age at the time of apprehension; [¶] (2) Is not convicted of first degree murder, committed when that person was 18 years of age or older, or sentenced to death, imprisonment for life . . . ."

no obligation to remand her for an evaluation report under section 707.2. [¶] For the reasons discussed below, we have concluded that Jeanice is entitled to the relief she seeks. Contrary to the main premise of the Attorney General's argument, we find that Jeanice's conviction does not render her automatically ineligible for CYA commitment. As we shall explain, pursuant to the current provisions of Penal Code section 190, Jeanice's conviction of first degree murder without special circumstances carries a '25 years to life' sentence; moreover, for more than 35 years, we have followed this court's decision in *People* v. *Ralph* (1944) 24 Cal.2d 575 . . . that a minor facing such an indeterminate sentence is not ineligible for CYA commitment under section 1731.5." (*In re Jeanice D., supra,* 28 Cal.3d at pp. 212-213.)

We hold that the rule of *Jeanice D.* is not changed by the enactment of section 190.5 by Proposition 115. The authorized punishment, rather than the nature of the offense, is controlling. (*In re Jeanice D., supra,* 28 Cal.3d at p. 216.) Proposition 115 did not amend Welfare and Institutions Code section 1731.5 relating to eligibility for Youth Authority commitment. As punishment for special circumstances murder, for persons over 16 and under 18 at the commission of the crime, Proposition 115 authorized a possible punishment of "25 years to life." This phrase had been consistently construed by the courts to permit a Youth Authority commitment. The applicable rule of statutory construction was stated by the court in *Jeanice D.* itself, which there construed the 1978 death penalty initiative statute. The court stated: "As this court observed nearly a half-century ago: 'It is a well-recognized rule of construction that after the courts have construed the meaning of any particular word, or expression, and the legislature subsequently undertakes to use these exact words in the same connection, the presumption is almost irresistible that it used them in the precise and technical sense which had been placed upon them by the courts.' [Citation.] [¶] This prime principle, moreover, applies equally to subsequent legislation adopted through the initiative process as to enactments passed by the Legislature itself." (*In re Jeanice D., supra,* 28 Cal.3d at p. 216. See *People* v. *King, supra,* 5 Cal.4th 59, 67-68 [legislative amendments to Welf. & Inst. Code, § 1731.5 and voter enactment of Welf. & Inst. Code, § 1732.5 overruled *Jeanice D.,* but only as to persons over the age of 18 at the time of the offense].) If the drafters of Proposition 115 had wished that youths under 18 at the time of a special circumstances murder not be eligible for Youth Authority commitment, they would not have used a phrase uniformly held to authorize such a commitment, at least without amending Welfare and Institutions Code section 1731.5. The Attorney General's argument that section 190.5, subdivision (b) provides only two alternatives, neither of which mentions the Youth Authority, is the same argument impliedly rejected in *Jeanice D., supra,* 28 Cal.3d at page 215 and footnote 5, interpreting former

section 190, which mentioned only death, life without parole, or 25 years to life.

The convictions of both Bustos and Loretto of first degree murder with special circumstances therefore did not render them ineligible for Youth Authority commitment, and the court was required by Welfare and Institutions Code section 707.2 to obtain a diagnostic study from the Youth Authority before sentencing appellants to state prison.

Such a study not only could assist the court as to the choice of a Youth Authority commitment. Even if the court rejects a Youth Authority commitment, a diagnostic study with the expertise of the Youth Authority might assist the court's choice between life without parole or 25 years to life. Additionally, the study might assist the court's exercise of its discretion under Welfare and Institutions Code section 1731.5, subdivision (c), to order one or both appellants *housed* at the Youth Authority while otherwise committed to the Department of Corrections.[7] (*People* v. *Marsh, supra,* 36 Cal.3d 134, 141-142; *People* v. *Camacho* (1993) 19 Cal.App.4th 1737, 1748-1749 [24 Cal.Rptr.2d 286].)[8]

We therefore remand this matter as to both Bustos and Loretto with instructions that the trial court obtain a diagnostic study from the Youth

---

[7]Welfare and Institutions Code section 1731.5, subdivision (c) provides: "(c) Any person under the age of 21 years who is not committed to the authority pursuant to this section may be transferred to the authority by the Director of Corrections with the approval of the Director of the Youth Authority. In sentencing a person under the age of 21 years, the court may order that the person shall be transferred to the custody of the Youth Authority pursuant to this subdivision. When the court makes such an order and the Youth Authority fails to accept custody of the person, the person shall be returned to court for resentencing. The transfer shall be solely for the purposes of housing the inmate, allowing participation in the programs available at the institution by the inmate, and allowing Youth Authority parole supervision of the inmate, who, in all other aspects shall be deemed to be committed to the Department of Corrections and shall remain subject to the jurisdiction of the Director of Corrections and the Board of Prison Terms. Notwithstanding subdivision (b) of Section 2900 of the Penal Code, the Director of the Department of Corrections, with the concurrence of the Director of the Youth Authority, may designate a facility under the jurisdiction of the Director of the Youth Authority as a place of reception for any person described in this subdivision."

[8]Part of the rationale of *Marsh* is that a diagnostic study might also persuade the court to exercise discretion under section 1385 to strike allegations which would otherwise render a defendant ineligible for Youth Authority commitment. (*People* v. *Marsh, supra,* 36 Cal.3d at pp. 142-143.) That part of *Marsh*'s rationale is inapplicable to special circumstances murder because Proposition 115 also enacted section 1385.1, which provides: "Notwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or nolo contendere or is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive." Section 1385.1 does not assist the People's argument here, however, because under our interpretation of section 190.5, appellants were eligible for possible Youth Authority commitment even with the findings of special circumstances intact.

Authority as required by Welfare and Institutions Code section 707.2, and conduct new sentencing hearings. This does not necessarily mean that the Youth Authority will make a favorable recommendation, or even if it did, that the court must commit appellants to the Youth Authority instead of to state prison. (*People* v. *Jones* (1988) 46 Cal.3d 585, 601-602 [250 Cal.Rptr. 635, 758 P.2d 1165].) It does mean the trial court will be fully informed of appellants' circumstances before exercising its sentencing alternatives. In light of this disposition, we do not address appellants' other contentions concerning the sentences imposed by the court.

### DISPOSITION

The sentences are vacated. The trial court is directed to refer appellants to the Youth Authority for diagnostic study as required by Welfare and Institutions Code section 707.2 and thereafter exercise its discretion in resentencing appellants. In all other respects, the judgments are affirmed.

Woods (A. M.), P. J., and Klein (Brett), J.,* concurred.

---

*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.