Filed 11/12/13  P. v. Brown CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C067117 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F09210) |
| v. |  |
| STEVEN BROWN, JR. et al., |  |
| Defendants and Appellants. |  |

In this unprovoked and random drive-by shooting with a semiautomatic handgun, the two teenage defendants both testified that the other one was the shooter.  A jury convicted 17-year-old Denzel Demar Crisp, the passenger, of discharging a firearm from a motor vehicle and assault with a semiautomatic firearm, but failed to reach a verdict on the attempted murder charge.  The related gun and great bodily injury enhancements were found to be true.  Eighteen-year-old Steven Brown, Jr., the driver, was convicted of assault with a semiautomatic firearm, knowingly permitting another person to discharge a

1

firearm from his vehicle, and carrying a concealed firearm. The related firearm enhancement was also found to be true.

Neither boy had a prior record. Whereas the trial court sentenced Crisp to state prison for an aggregate term of 30 years to life, it sentenced Brown to seven years eight months. On appeal, defendants challenge several jury instructions, the sufficiency of the evidence, and, in Crisp's case, the constitutionality of his sentence. We affirm.

## FACTS

On the night of December 18, 2009, defendants had difficulty finding a party hosted by Jennifer Ly. Thinking they had found it, they walked up to a group of people standing outside a residence at what turned out to be a family 21st birthday party. They were told there was no Jennifer at the party and they left. One guest testified that Brown appeared to be "[a] little angry." No one else, including defendants, testified there was any altercation, any unkind or agitated interaction, or any hard feelings. Defendants were simply at the wrong party.

They got back in their car. There is some dispute as to the route they then took, but they ended up in front of the same party with their lights off, and as the driver slowed down, witnesses saw an arm stick out of the passenger window and heard two or three gunshots. Andrew Tapalla had just arrived at the party when he was shot in the buttocks. Emergency personnel took him to the hospital, where he was given morphine to control the pain, but the bullet was not removed. He missed four days of work.

Defendants fled the scene. Shocked that Crisp had just fired a gun out of the window of his car, Brown testified he asked Crisp, "What the fuck are you doing?" He did not know Crisp had fired into a group of people or that anyone had been hit. He planned to take Crisp home. Crisp, who testified that it was he who was shocked that Brown reached in front of him to shoot out of the passenger window, claimed they had no conversation at all. Both defendants testified it was not their gun, they had never shot a gun before, and they did not shoot it at the group of partygoers after they left.

2

Several witnesses testified that someone fired the shots from the passenger side of a Ford Mustang.  At least two witnesses testified they saw an arm sticking out of the window, and one testified it was out at least as far as his elbow.

Brown pulled into a gasoline station with the police in hot pursuit.  He testified that after he parked he asked Crisp to hand him the gun because he was afraid of what Crisp would do with it.  He planned to turn it over to the police.  Although he testified he had never owned or used a gun before, he saw a small button on the bottom of the gun, depressed it, and removed the magazine.  But he then reloaded the gun, placed it in his waistband, and got out of the car.

A police officer testified that he asked Brown if he had a gun, and Brown shook his head to indicate he did not.  Brown denied the police officer had asked him.  Rather, according to Brown, the police officers threw him against a police car, banged his head into the car, and yelled at him.  In the process, the gun fell from his left pant leg to the ground.  Officers found a .25-caliber spent cartridge casing fired by the gun retrieved from Brown in the space between the center console and the front passenger seat.

Crisp testified he did not know Brown was armed that night until he saw him pull a gun out of the pocket of his peacoat.  Because the night was so cold, he asked Brown if he could borrow some gloves.  He testified that he wore the gloves all night, including while he was texting Jennifer and his mother.

A criminalist testified that both Brown and Crisp tested positive for gunshot residue.  From the testing he conducted, the criminalist found more on Crisp's hand than on Brown's, but he did not do a complete reading of Brown's sample.  Based on the gunshot residue evidence, it could not be determined who had fired the gun.

Both defendants appeal.

3

## DISCUSSION

## I.

Defendant Crisp contends the trial court erred in instructing the jury, pursuant to CALCRIM No. 361, that it could consider a defendant's failure to explain or deny adverse evidence. " 'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference [citation].' " (*People v. Saddler* (1979) 24 Cal.3d 671, 681 (*Saddler*).) The Supreme Court in *Saddler* provides three exemplars of the type of testimony that justifies highlighting a defendant's failure to explain or deny "any fact of evidence that was within the scope of relevant cross-examination." (*Id*. at p. 682.)

"Giving of the instruction was upheld in *People* v. *Ing* [(1967)] 65 Cal.2d 603, where the defendant took the stand and denied committing three charged rapes but failed to mention or refer to uncharged offenses which the court had determined were relevant to show common scheme or plan. In *People* v. *Perez* [(1967)] 65 Cal.2d 615, unexplained offenses (two charged robberies and an uncharged robbery) were held within the scope of proper cross-examination and the instruction appropriate when the defendant testified and presented an alibi as to only two of the four charged robberies. In *People* v. *Thornton* [(1974)] 11 Cal.3d 738, the instruction was again held to be properly given when the defendant testified and denied committing one charge of rape but did not testify concerning the two uncharged sexual assaults which had been admitted as relevant to the issue of identity." (*Saddler*, *supra*, 24 Cal.3d at p. 681.)

In each of these cases, the defendant's failure to explain or deny his involvement in some, but not all, of the charged offenses left a blatant hole in his defense and certainly justified asking the jury to consider the failure and to determine what effect it would have on the assessment of his credibility and, indeed, his defense. But these exemplars stand

4

in stark contrast to the equivocation and dissembling of the young, frightened teenager here.

The Supreme Court also reminds us "a contradiction is not a failure to explain or deny," and there must be facts or evidence within the defendant's knowledge that he does not explain or deny. (*Saddler*, *supra*, 24 Cal.3d at p. 682.) But this is where the distinction gets fuzzy. The test for giving the instruction is "not whether the defendant's testimony is believable." (*People v. Kondor* (1988) 200 Cal.App.3d 52, 57 (*Kondor*).) " '[CALCRIM No. 361] is unwarranted when a defendant explains or denies matters within his or her knowledge, no matter how improbable that explanation may appear.' [Citation.]" (*People v. Lamer* (2003) 110 Cal.App.4th 1463, 1469 (*Lamer*).)

Thus, a defendant's unbelievable and improbable explanations do not warrant the instruction. On the other hand, as we explained in *People v. Mask* (1986) 188 Cal.App.3d 450, "if the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible, the inquiry whether he reasonably should have known about circumstances claimed to be outside his knowledge is a credibility question for resolution by the jury." (*Id.* at p. 455.) To render the analysis even more squishy, "[i]t is entirely proper for a jury, during its deliberations, to consider *logical gaps* in the defense case, and the jury is reminded of this fact by the instruction at issue." (*People v. Redmond* (1981) 29 Cal.3d 904, 911, italics added.)

Applying these cases to Crisp's testimony leaves us in a bit of a quandary. Do his explanations qualify as merely improbable and unbelievable or as bizarre and implausible? It goes without saying that his explanations lack clarity. But to struggle to pigeonhole them as improbable rather than implausible, or unbelievable rather than bizarre, is an unnecessary semantic exercise when the error in giving the instruction in this case, if any, is harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

"[R]eversal is required only when it is reasonably probable a more favorable result would have been reached had the instruction been omitted." (*Kondor*, *supra*,

5

200 Cal.App.3d at p. 57.)  By its terms, CALCRIM No. 361, like its predecessor CALJIC No. 2.62, "does not direct the jury to draw an adverse inference.  It applies *only if the jury finds that the defendant failed to explain or deny evidence*.  It contains other portions favorable to the defense (suggesting when it would be unreasonable to draw the inference; and cautioning that the failure to deny or explain evidence does not create a presumption of guilt, or by itself warrant an inference of guilt, nor relieve the prosecution of the burden of proving every essential element of the crime beyond a reasonable doubt)."  (*People v. Ballard* (1991) 1 Cal.App.4th 752, 756, italics added; see *Lamer*, *supra*, 110 Cal.App.4th at p. 1472.)

It is appropriate, particularly on facts such as these, that where Crisp's explanations were subject to interpretation, the jury was allowed to make or reject any inference it might have drawn from his explanations.  If, as Crisp asserts, his explanations satisfied the jurors, they were at liberty to reject any adverse inference.  Moreover, whatever equivocation they spotted in his answers during cross-examination paled in significance to the strength of the prosecution's case against him.

Two eyewitnesses testified that they saw an arm extended out of the window and one of them reported that it was out of the window at least as far as his elbow, thereby contradicting defendant Crisp's testimony that it was Brown, the driver, who fired the gun out the passenger's window.  This testimony, coupled with the significant amount of gunshot residue found on the back of Crisp's hand, and contrary to his testimony that he was wearing gloves the entire night, corroborated the eyewitness testimony.  We therefore conclude that it is not reasonably probable defendant Crisp would have obtained a more favorable outcome even if the instruction had not been given.[1]  Reversal is not required.

---

[1]  Defendant Brown makes the global and nonspecific request to join in any of his codefendant's arguments that inure to his benefit, apparently forgetting that he bears the

6

Brown complains the trial court deprived him of the opportunity to prove the essence of his defense by refusing to instruct the jury on necessity; that is, that he averted a potential greater harm by taking the gun away from Crisp. Whether rooted in the Sixth Amendment rights to trial by jury and compulsory process, or in the due process clause of the Fourteenth Amendment, the United States Constitution guarantees a criminal defendant's right to have the jury instructed on the defense theory of the case, and any doubts concerning the sufficiency or credibility of the evidence needed to warrant the instruction should be resolved in favor of the defendant. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690-691 [90 L.Ed.2d 636]; *People v. Ratliff* (1986) 41 Cal.3d 675, 694.)

Brown requested the trial court to instruct the jury on necessity as embodied in CALCRIM No. 3403 as follows:

"In order to establish this defense, the defendant must prove that:

"1.     (He/She) acted in an emergency to prevent a significant bodily harm or evil to (himself/herself/[or] someone else);

"2.     (He/She) had no adequate legal alternative;

"3.     The defendant's acts did not create a greater danger than the one avoided;

"4.     When the defendant acted, (he/she) actually believed that the act was necessary to prevent the threatened harm or evil;

"5.     A reasonable person would also have believed that the act was necessary under the circumstances;

"AND

"6.     The defendant did not substantially contribute to the emergency.

---

burden of demonstrating prejudicial error. We do not see how Crisp's CALCRIM No. 361 applies to Brown and therefore we can find no prejudicial error.

"The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the defendant must prove that it is more likely than not that each of the six listed items is true."

The court refused to give the necessity instruction. The court explained: "I did not feel the circumstances in this matter rose to the type of emergency that's contemplated by that defense. And for that reason as well as the fact that I was giving the transitory possession instruction, which I thought better probably captured sort of the defense's theory relative to Mr. Brown."[2]

The scope of the necessity defense " 'is very limited and depends on the lack of a legal alternative to committing the crime. It excuses criminal conduct if it is justified by a need to avoid an imminent peril and there is no time to resort to the legal authorities or such resort would be futile.' [Citation.]" (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1164.) "As a matter of public policy, self-help by lawbreaking and violence cannot be countenanced where the alleged danger is merely speculative and the lawbreaker has made no attempt to enlist law enforcement on his side." (*People v. Miceli* (2002) 104 Cal.App.4th 256, 268.)

Brown insists he was shocked when Crisp pulled out a gun and shot at the partygoers and thus he reasonably believed that Crisp might again act irrationally once

---

[2] The "transitory possession" instruction is set forth in CALCRIM No. 2520 as follows: "If you conclude that the defendant possessed a firearm, that possession was not unlawful if the defendant can prove the defense of momentary possession. In order to establish this defense, the defendant must prove that: [¶] 1. He possessed the firearm only for a momentary or transitory period; [¶] 2. He possessed the firearm in order to abandon, dispose of, or destroy it; [¶] AND [¶] 3. He did not intend to prevent law enforcement officials from seizing the firearm. [¶] The defendant has the burden of proving each element of this defense by a preponderance of the evidence. Proof by a preponderance of evidence is proof that something is more likely to be true than not true."

8

the police had surrounded them. In his account, he took possession of the gun to prevent Crisp from shooting again. Based on his subjective belief and Crisp's objectively dangerous behavior only minutes earlier, he contends he was entitled to the necessity instruction.

The Attorney General argues that Brown's purported justification is nothing but raw speculation that Crisp would take aim at trained police officers who had him surrounded or, even more speculatively, shoot Brown. Moreover, the Attorney General points out that Brown did not demonstrate he lacked other alternatives, such as throwing the gun out the window or alerting law enforcement. Instead, the police officer testified that Brown denied having a gun, and it was only discovered when it fell from his waistband and hit the ground. At sentencing the trial court expressed its belief, as the Attorney General does now on appeal, that Brown substantially contributed to the alleged emergency situation. Indeed, the trial court believed that he was the real instigator. In short, the Attorney General would have us affirm the trial court's decision to refuse the necessity instruction because Brown failed to present substantial evidence of each of the six elements of the defense.

The Attorney General's argument is compelling. But even if we were to decide that Brown's theory of necessity was speculative and objectively unreasonable, we would affirm the trial court's refusal on narrower grounds. Giving every benefit of doubt to defendant, as we must, we will assume that he honestly and reasonably believed that Crisp remained armed and dangerous and that he needed to disarm him to avert danger to the police officers and to himself. But Brown did not dispose of the gun once he had disarmed his friend. His conduct after he took the gun undermined any legitimate claim to a necessity defense.

Brown testified he had never handled a gun before the night of the shooting. Yet once he had possession of the gun, he noticed a button on the bottom, depressed it, and thereby released the magazine. By then the gun was disabled and any possible

9

emergency had vanished. But he did not rid himself of the gun or the ammunition. Rather, he reloaded it and armed himself by putting the gun in his waistband. Once ordered out of the car, he did not turn over the gun or even acknowledge that he had one.

The jury convicted Brown of three offenses, but the defense of necessity applied to only one—carrying a concealed firearm. Brown committed that offense when he reloaded the magazine, put the gun in his waistband, and got out of the car with the gun concealed. None of the arguments he makes on appeal address those crucial minutes. Whether or not Brown averted a greater harm by disarming Crisp is simply not the dispositive question, for it was not the disarming that constituted the offense, but rather when he armed himself with the gun by hiding it in his waistband. The trial court did not err by refusing to instruct on the defense of necessity because there was no necessity; that is, there was no emergency when he concealed the gun.

### III

Brown also contends the trial court erred by instructing the jury that if it found he attempted to hide evidence, "that conduct may show that he was aware of his guilt." (CALCRIM No. 371.) He complains there was no evidence that he made any efforts to suppress or hide evidence, and therefore, there is no logical inference of a consciousness of guilt that is not sheer conjecture. His argument is based solely on his version of the facts. The record belies his claim of instructional error.

As we recounted above, Brown testified he took the magazine out of the gun and then reinserted it before he put it in his waistband. He insists that he did not deny having a gun; he simply could not answer because the police were slamming his head into a car. It was the jury's prerogative to believe his account or that of the police officer who testified that when asked if he had a gun, he indicated he did not by shaking his head. But on appeal, we certainly are not at liberty to reject the circumstantial evidence that he was hiding evidence by putting the gun in his waistband and failing to turn it over to the police. That evidence was sufficient to justify the trial court's instruction to the jury.

10

# IV

Crisp argues there is insufficient evidence to support the jury's finding that the victim sustained great bodily injury. He contends the victim suffered only minor or moderate harm since he did not require surgery, he was released from the hospital within a few hours with some painkillers, he only missed a few days of work, and, although he limped for a short time, he fully recovered. In his view, the injury was neither significant nor substantial within the meaning of Penal Code section 12022.7. We disagree.

"It is well settled that the determination of great bodily injury is essentially a question of fact, not of law. ' "Whether the harm resulting to the victim . . . constitutes great bodily injury is a question of fact for the jury. [Citation.] If there is sufficient evidence to sustain the jury's finding of great bodily injury, [the appellate court is] bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding." ' [Citation.]" (*People v. Escobar* (1992) 3 Cal.4th 740, 750.) The injury "need not meet any particular standard for severity or duration, but need only be 'a substantial injury *beyond* that inherent in the offense itself[.]' [Citation.]" (*People v. Le* (2006) 137 Cal.App.4th 54, 59.)

Defendant cites by way of example cases with far more serious injuries than suffered by the victim here. (See, e.g., *People v. Cross* (2008) 45 Cal.4th 58, 63; *People v. Wolcott* (1983) 34 Cal.3d 92, 107.) By contrast, the Attorney General relies on cases where only abrasion, lacerations, and bruising constituted great bodily injury. (See, e.g., *People v. Sanchez* (1982) 131 Cal.App.3d 718, 733; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1755.) The cases demonstrate there is a wide spectrum of injuries that may constitute great bodily injury, and it is up to the jury to make that determination.

Here there is substantial evidence to support the jury's finding. While the victim was lucky to have escaped grave injury, even death, his injury can hardly be characterized as insignificant or trivial. Indeed, it is hard to imagine that anyone who has been shot and had a bullet lodged in his body did not sustain great bodily injury. In any

event, he testified he suffered terrific pain, was treated at the hospital, required morphine, limped, and missed work for several days. The jury could reasonably conclude on this evidence the injury was significant and substantial.

V

Crisp, who was 17 years old and had no prior offenses when he shot the victim, argues that his 30-years-to-life sentence was cruel and unusual punishment under both the federal and state Constitutions. We agree with Crisp that the Attorney General's analogies to lengthy sentences for three strike adult recidivists are inapposite. (*Lockyer v. Andrade* (2003) 538 U.S. 63 [155 L.Ed.2d 144] and *Ewing v. California* (2003) 538 U.S. 11 [155 L.Ed.2d 108].) Nevertheless, he fails, under relevant authority, to demonstrate that the sentence, though lengthy, is "grossly disproportionate" under the federal Constitution (*People v. Em* (2009) 171 Cal.App.4th 964, 977), nor does it "shock[] the conscience" and "offend[] fundamental notions of human dignity" (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*)).

Crisp repeats many of the compelling factual and legal arguments he made at sentencing. Witnesses at trial had attested to his character as a polite, conscientious student, whom they had never known to cause trouble, react in anger, or show any sort of temper. Defense counsel's statement in mitigation contained numerous letters on his behalf from family members, family friends, teachers, and clergy. Moreover, he demonstrated exemplary conduct in juvenile hall, obtained his high school diploma, and continued to take college courses. He certainly did not fit the profile of a typical young gangster.

While acknowledging this young man's potential, we also acknowledge his immaturity, his susceptibility to peer pressure, and his underdeveloped sense of responsibility. Crisp points to the emerging trends in the United States and California Supreme Courts to incorporate these vulnerabilities typically found in young brains in assessing the culpability of children. (*Roper v. Simmons* (2005) 543 U.S. 551, 568

12

[161 L.Ed.2d 1]; *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825] (*Graham*); *People v. Caballero* (2012) 55 Cal.4th 262, 267-268 (*Caballero*).) Perhaps the Attorney General reads these cases too narrowly and the logic of the emerging jurisprudence is broader than capital or life-without-the-possibility-of-parole cases. We have no reason to quarrel with Crisp's understanding of the evolution of the law or his account of his personal attributes and the aberrational quality of his random shooting. But he goes too far when he equates a 30-years-to-life term to a death sentence, life without the possibility of parole, or a sentence that exceeds a juvenile's life expectancy. Having embraced the basic science that young brains are not fully developed, both the United States and California Supreme Courts have shunned the notion that a child offender is incorrigible and irredeemable. As a consequence, sentences that deprive them at the time of sentencing of a meaningful opportunity at any time in the future to demonstrate their rehabilitation and fitness to reenter society are a violation of the Eighth Amendment's prohibition of cruel and unusual punishment.

Crisp, however, has not been denied the opportunity to demonstrate rehabilitation in the future. Although a 30-years-to-life term is long, it is not permanent. Crisp, unlike his counterparts in *Graham*, *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455], and *Caballero*, will have a meaningful opportunity in the future to demonstrate his rehabilitation and his fitness to reenter society. The recent evolution in the law does not assist him.

Moreover, we must remind him that we are neither the Legislature nor the sentencing court. "[I]n our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and . . . such questions are in the first instance for the judgment of the Legislature alone. [Citations.]" (*Lynch*, *supra*, 8 Cal.3d at p. 414.) The trial court presided over the trial and heard all the witnesses testify, including those who spoke on behalf of Crisp.

13

Thus, we cannot supplant a sentence authorized by the Legislature and applied by the court with our own notion of what Crisp deserves or whether this sentence is a disservice to his community and society at large. Our role is exceedingly narrow in determining whether the 30-years-to-life term is grossly disproportionate, shocks the conscience, or offends fundamental notions of human dignity. With those concepts as the bar, we simply cannot say that a lengthy sentence for a drive-by shooter, who but for grace or luck or divine intervention could have killed the victim or others standing nearby, is cruel and unusual punishment. Indeed, the victim was shot, suffered pain, required medication, and missed work. We reject Crisp's invitation to find his sentence grossly disproportionate because his victim recovered and thereby to benefit him because his victim was lucky enough to survive. Crisp fails to sustain his considerably heavy burden.

## DISPOSITION

The judgments are affirmed.

                                                        RAYE            , P. J.

We concur:


          HULL          , J.


          MAURO          , J.

14