Filed 10/19/16

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE MANUEL REYES-TORNERO,<br><br>    Defendant and Appellant. | F069243<br><br>(Tulare Super. Ct. No. VCF247072)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Brett R. Alldredge, Judge.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part[s] I through IV of the Discussion.

**SEE CONCURRING OPINION**

## INTRODUCTION

Defendant/appellant Jose Manuel Reyes-Tornero approached four men at an outdoor card game. He pointed a gun at each of them and demanded their wallets. One of the men, Efren Cisneros,[1] refused to surrender his wallet and a struggle ensued wherein defendant shot Efren, causing great bodily injury. None of the other three card players were injured.

Defendant was convicted of four counts of assault with a firearm, among other crimes. The jury found true allegations that defendant had inflicted great bodily injury (GBI) on *Efren specifically* with respect to *each* of the four assaults.

Defendant contends that Penal Code section 654[2] prohibits multiple punishment on multiple great bodily injury enhancements relating to the same injuries to the same individual. Citing *People v. Oates* (2004) 32 Cal.4th 1048 (*Oates*), the Attorney General responds that the "multiple victim" exception to section 654 applies because there were multiple victims of the several assaults to which the GBI enhancements were attached.

Under *Oates*, the relevant "act[s] or omission[s]" are the assaults and the GBI enhancements "simply follow from" those assaults. And because there were multiple victims of the assaults, the multiple victim exception to section 654 applies and multiple punishment is permitted. We affirm the judgment.[3]

## BACKGROUND

On February 27, 2012, a second amended information charged defendant with attempted murder (count 1; § 664/187, subd. (a)); four counts of robbery (counts 2–5;

---

[1] One of the assault victims, Jose Huerta Ramos, is sometimes referred to as "Huerta" and other times, "Ramos." Efren testified that his last name is Cisneros but also uses the last initial "V." To avoid confusion we refer to the victims by their first names; no disrespect is intended.

[2] All future statutory references are to the Penal Code unless otherwise noted.

[3] In the unpublished portion of the opinion we reject several additional claims made by defendant.

2.

§ 211); four counts of assault with a firearm (counts 6–9; § 245, subd. (a)(2)); and two counts of false personation (counts 10–11; § 529). The information alleged that, in committing the attempted murder and robberies, defendant personally and intentionally discharged a firearm causing great bodily injury. (§ 12022.53, subds. (b)–(d).) The information also alleged that in the commission of the assaults (counts 6–9), defendant personally inflicted great bodily injury on Efren.[4] (§ 12022.7, subd. (a).)

Defendant pled no contest to the false personation counts. The remaining counts were tried to a jury, which eventually deadlocked resulting in a mistrial. A second jury trial began on November 4, 2013. The second jury convicted defendant on all counts and found the enhancement allegations true.

The court sentenced defendant to the following prison terms: 10 years each for counts 6, 7, 8 and 9, which included three years for assault, plus four years for the firearm enhancement (§ 12022.5), plus three years for the great bodily injury enhancement (§ 12022.7);[5] a consecutive term of seven years to life on count 1, plus a consecutive term of 25 years to life for the firearm causing great bodily injury enhancement (§ 12022.53, subd. (d)); 28 years to life each for counts 2, 3, 4, and 5.[6] No prison time was imposed on counts 10 and 11.

## FACTS

For years leading up to December 4, 2010, Nazario Hernandez had hosted card games at his home about three times a week.

---

[4] Efren was identified by the initials E.V. in the information. (See fn. 1, *ante*.)

[5] The sentence on count 6 was stayed pursuant to section 654 and the sentences on count 8 and 9 were to run concurrent to the sentence on count 7.

[6] The sentence on count 3 was to run consecutively to the sentence on count 2; the sentence on count 2 was to run concurrently to count 1; and the sentences on counts 4 and 5 were to run concurrently with the sentence on count 2.

**Events of December 4, 2010**

One of these card games took place outside Nazario's trailer on December 4, 2010. In attendance at the outdoor card game were Jose Ramos, Efren Cisneros, Ignacio Martinez, and Nazario Hernandez. Other individuals were playing another card game inside the trailer.

*Efren's Account*

Around 8:00 or 8:30 p.m., Efren first noticed a man about three or four feet from the card table. Nazario was walking towards his trailer when the man "asked" for his money. Nazario thought the man was "playing" and "didn't pay any attention."

Then, the man came to where Efren was playing cards with Jose and Ignacio. The man had a gun and was covering his "head" with his sweatshirt. The man fired a warning shot at the ground, then threatened Jose and Ignacio with the gun by "put[ting] it behind them or on their head." The man told them, in Spanish, that he wanted their money. There was about $250 or $300 from the card game on the table. Jose and Ignacio said they would give him the money, but refused to give him their wallets.

The man then came towards Efren and pointed the gun at him. Efren also told the man that he could have the money but not his wallet. The man shot Efren below his right eye, next to his nose. Efren "guess[ed] he got frustrated from what I was saying so then I turned around and that is when I was shot…." Efren then got up and tried to grab the man. During the short struggle, the man's face became uncovered and Efren got a good look at him. The man then shot Efren three more times. Efren saw the man take the money that had been on the table and left. Efren then drove himself to the hospital.

At trial, Efren identified defendant as the shooter.

*Ignacio's Account*

At some point during the evening of December 4, 2010, a man with a black coat covering half his face approached the card game. The man stood behind Ignacio and silently watched the card game for "about 1 minute." Ignacio did not think it was

4.

unusual to see someone he did not know because "a lot of people go" to Nazario's card games.

After watching the game for a minute, the man pulled out a gun "like a revolver" and demanded money. The man spoke only in Spanish. Ignacio thought the man was joking until he fired a warning shot. The man pointed the gun at Jose's head and said he would shoot him unless they gave him the money and their wallets. Efren tried to grab the gun, and the two "started scuffling." During the scuffle, the gunman's face became fully visible. Ignacio then heard three or four gunshots. The gunman "ran out" but returned to get the money on the table. Ignacio estimated there had been $80 or $120 on the table.

In court, Ignacio identified defendant as the gunman.

*Jose's Account*

Jose testified while in custody for drug possession and methamphetamine use.

While Jose was playing cards, a man "came in and started looking around." The man pulled out a gun, pointed it at Jose and told him to put his money on the table.[7] The man said, "I'm not playing around asshole." The gunman also asked for wallets, so Jose put his wallet on the table. He told Jose to pull out the money from his wallet, but Jose responded that he did not have money in the wallet. The gunman told Jose to pull money out of his pockets, so Jose retrieved $20 or $35. Jose could not see the gunman's entire face because he "had a jacket zipped up to the top."

Next, the gunman went to Ignacio and made the same demands. Ignacio "put his things on the table." At some point, the gunman said, "I am not playing around. If you don't give it to me I am going to kill you, asshole."

---

[7] Jose's actual testimony was that the gunman "placed [the gun] on my head…."

5.

Efren told the gunman, "[T]hat's all we have here." The gunman told Efren to "shut up" and to put his money on the table. Efren "stood up to try to go for his gun" and was shot. Efren and the gunman fought. The gunman grabbed the money before he left.[8]

At trial, Jose said he was not able to see the gunman's face "too well." The prosecution then asked Jose whether he had testified at the preliminary hearing that he could see the gunman's face "more or less." Jose said he did not remember, but "perhaps" he had said that.

Nonetheless, Jose testified at trial that he "think[s]" defendant was the gunman.

*Nazario's Account*

Sometime after 7:00 or 8:00 p.m., on December 4, 2010, a man with a gun and a sweater covering his face appeared. At the time, Nazario was "beside" the other three men playing cards. The man "put the gun to everybody's head" and demanded their wallets. Nazario thought the man was joking and made a swiping gesture as if to "shoo" him away. Nazario did not give the man his wallet. The man and Efren began "fighting" and the two fell to the ground. Nazario "got up" and did not see the shots that were fired.

Nazario testified at trial that he did not see the shooter's face.

Nazario said he did recall testifying twice in the past on this case. The prosecutor then asked whether Nazario recalled having previously identified defendant, in court, as the man who was "there that night December 4th." Nazario said he did not recall so testifying.

**Events after December 4, 2010**

*Photographic Lineups*

Jose, Efren, Nazario and Ignacio each identified defendant as the shooter in photographic lineups shown to them by Detective Frank Zaragoza.[9]

_____

[8] From Jose's testimony, it is not clear if "the money" refers to the card game money, the money the men had emptied from their pockets, or both. When asked how much money had been on the table, Jose testified, "$30, 35. I don't remember too well."

*Efren's Injuries*

Efren was hospitalized for seven days. Two bullets were removed from his body, and two bullets were left in his body.

Defendant's Arrest and Interrogation

Defendant was arrested on January 13, 2011. Detective Zaragoza interrogated defendant that day. An audio recording of the interrogation was played for the jury. Defendant told Zaragoza that he "wasn't in town" on December 4, 2010.[10]

*Cell Phone Records*

A Sprint telephone records custodian testified that cellular calls are generally routed to cell phone towers that are two to 10 miles from the phone's location. However, if a tower is "over-capacitated" then a call would be routed to the closest open tower, which could be outside the two to 10-mile range.

The records custodian testified that the cell phone number belonging to "Eric Contreras"[11] was involved in a phone call at 8:22 p.m. on December 4, 2010. That call originated on tower number 174, which is located in Tulare.

*Defendant's Case*

Defendant's uncle, Rogelio Reyes (Reyes), testified that he went to Nazario's trailer on a regular basis in 2010 and was there on the night of December 4, 2010. Reyes saw the gunman but could not see his face because it was partially covered by a jacket or sweater.

---

[9] Nazario was initially hesitant to cooperate with the photographic lineup. However, he eventually selected defendant's photograph. At trial, Nazario initially testified that he recalled being shown the photograph lineups, but shortly thereafter said he did not "remember if I saw them or not, I don't remember."

[10] Defendant's interview is described in further detail below.

[11] The parties stipulated that, at the time of these events, defendant went by the name Eric Gil Contreras.

Reyes said the gunman was "more or less like my size" except "a bit less fat than myself." Reyes testified he was 5 feet 7 inches tall. Reyes said defendant was not the gunman. The gunman did not have defendant's "figure."

The defense called an expert witness on eyewitness identification. The expert testified that eyewitness identifications of strangers are unreliable.

## DISCUSSION

**I.     There is Substantial Evidence Defendant Inflicted Great Bodily Injury on Efren "In the Commission of" His Assaults on Jose, Ignacio, and Nazario***

Defendant was convicted of assaulting Efren (count 6), Jose (count 7), Ignacio (count 8), and Nazario (count 9). As to each of the assaults, the jury found that defendant personally inflicted great bodily injury on Efren. Defendant does not challenge the great bodily injury enhancement with respect to the assault on Efren (i.e., count 6). Rather, he argues that the assaults on Jose, Ignacio and Nazario "did not result in any injuries being inflicted on Efren, and each assault was complete when the robber stopped pointing the gun at the other men." As a result, he contends there was insufficient evidence supporting the GBI enhancements to the assaults on Jose, Ignacio and Nazario (i.e., counts 7, 8, and 9). We disagree.

### A.     Standard of Review

"Whether great bodily injury occurred is a question of fact, and we review a jury's finding of great bodily injury under the substantial evidence standard." (*People v. Le* (2006) 137 Cal.App.4th 54, 59.) "[W]e review the record in the light most favorable to the prosecution and may not reverse the judgment if any rational trier of fact could have found the essential elements of the enhancement beyond a reasonable doubt." (*People v. Frausto* (2009) 180 Cal.App.4th 890, 897.) "A finding that the victim suffered great bodily injury must be upheld on appeal if supported by substantial evidence, even if the

---

* See footnote, *ante*, page 1.

8.

circumstances could also be reconciled with a contrary finding." (*People v. Bustos* (1994) 23 Cal.App.4th 1747, 1755.)

"[O]ur consideration of the sufficiency of the evidence in this case also requires us to construe the applicable statute. For this task, we apply a de novo standard of review…." (*People v. Frausto*, *supra*, 180 Cal.App.4th at p. 897.)

### B. Defendant Inflicted GBI on Efren "In the Commission of" His Assaults on the Other Victims

"Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony…" is subject to a sentence enhancement. (§ 12022.7, subd. (a).) The issue here is whether Efren's injuries were inflicted "in the commission of" the assaults on Jose, Ignacio and Nazario.

Courts construe the phrase "in the commission of" broadly. (*People v. Elder* (2014) 227 Cal.App.4th 411, 422–423.)

Similar language concerning the commission of a felony appears in several statutes and conveys the same meaning. (*People v. Jones* (2001) 25 Cal.4th 98, 108, fns. 4 & 6, 109 (*Jones*); *People v. Contreras* (1997) 55 Cal.App.4th 760, 764.) For example, in *In re Tameka C*. (2000) 22 Cal.4th 190, the Supreme Court interpreted the same language used in section 12022.5. That enhancement applies when a person uses a firearm "in the commission of" a felony or attempted felony. (§ 12022.5, subd. (a).) The court interpreted "in the commission of" to mean "during and in furtherance of …." (*Tameka C.*, *supra*, 22 Cal.4th at pp. 197–198.) The court also drew on precedent which interpreted another statute's use of the phrase "in the commission of" to mean "tak[ing] place *during* the underlying crime and … hav[ing] some '*facilitative nexus*' to that offense." (*Id*. at p. 197.)

Defendant essentially argues that the infliction of GBI on Efren did not take place "during" the assaults on Jose, Ignacio and Nazario because those assaults were completed when the gun was no longer pointed at them. We disagree.

9.

"Section 245, subdivision (a)(2), punishes '[a]ny person who commits an assault upon the person of another with a firearm.' " (*People v. Licas* (2007) 41 Cal.4th 362, 366.) "Assault with a deadly weapon can be committed by pointing a gun at another person [citation], but it is not necessary to actually point the gun directly at the other person to commit the crime." (*People v. Raviart* (2001) 93 Cal.App.4th 258, 263.) A defendant commits assault when he, acting with the requisite intent, draws and holds a gun in such a position that he *could* use the weapon before the victim could defend himself, *even if the gun is not pointed at the victim*. (*Ibid*., quoting *People v. McMakin* (1857) 8 Cal. 547.) Similarly, a defendant also commits assault when he points a gun *between* two victims, but not *at* either victim. (*People v. Raviart*, *supra*, 93 Cal.App.4th at p. 264, citing *People v. Thompson* (1949) 93 Cal.App.2d 780.)

Based on these examples of assault with a deadly weapon, we conclude there was substantial evidence defendant's assaults on Jose, Nazario, and Ignacio were still ongoing when he inflicted GBI on Efren. Though the defendant may have satisfied the elements of assault with a deadly weapon the moment he pointed the gun at each individual, it does not follow that each assault ended the moment he pointed the gun at someone else. To the contrary, even when the gun was pointed at Efren, defendant could have quickly used it against the other assault victims.[12] Consequently, we conclude that defendant inflicted GBI on Efren "in the commission" of the assaults on Jose, Nazario, and Ignacio.

---

**12** There was conflicting testimony regarding whether Nazario was sitting down at the game when the assault occurred. However, because there is substantial evidence that Nazario *was* sitting down at the card game, it is irrelevant that there was also some contrary evidence he was walking towards the trailer. Nazario himself testified that he "was sitting there" when the struggle between Efren and defendant occurred, and that he "then … stood up."

10.

**II. The Trial Court did not Commit Reversible Error in Denying Defendant's *Marsden* Motion**[*]

On March 8, 2012, defendant's first trial ended in a deadlocked jury and mistrial. Defendant's second trial in 2013 resulted in convictions on all counts. Defendant made two *Marsden*[13] motions before his first trial, the details of which are provided below. The record discloses no *Marsden* motions made after the first trial.

On August 11, 2011, a *Marsden* hearing was held wherein defendant expressed dissatisfaction with his counsel. Defendant asserted that his attorney had not interviewed witnesses. Counsel responded that defendant's true desire was to have him to try to elicit statements from witnesses that contradict their testimony at the preliminary hearing. Counsel said he was "hesitant to do that for a variety of strategic purposes." He was concerned that if the witnesses confirmed what they said at the preliminary hearing, it would reinforce damaging testimony.

Earlier on the day of the *Marsden* hearing, defendant had requested that an investigator interview the witnesses "using a different name" for defendant: Mr. Reyes. Defendant wondered if the witnesses "would respond … differently" if the name "Mr. Reyes" was used. Counsel said he was willing to do that within the next five to seven days. The court suggested continuing the matter for "about two weeks and let's see if it gets done." Defendant responded, "Yeah. That's perfect. If it gets done, I'm not asking for new counsel."

Another *Marsden* hearing was held on December 8, 2011. Defendant asserted that counsel said he would provide him a copy of his "legal paperwork," but had not done so. Counsel responded, "I spent hours a while back copying everything, redacting things. I

---

[*] See footnote, *ante*, page 1.

[13] *People v. Marsden* (1970) 2 Cal.3d 118.

11.

made a stack that was very thick and I sent it off to the jail and I don't know why he does not have that."[14] Counsel said he would make another set of the paperwork that day.

Defendant also said he had only spoken with counsel once outside of court within an 11-month period. The court asked defendant several follow up questions, the answers to which indicated that defendant had been interviewed at the jail once by a defense investigator and another time by counsel.

Defendant also said that counsel had spoken to him "offensively." The court observed that sometimes an attorney "has to tell a client things." Defendant replied, "He doesn't have to tell me to sit the f**k down." Counsel did not respond to defendant's clear implication that he had used profanity.

The court denied defendant's *Marsden* motion.

A.      Standard for *Marsden* Motions

"When a defendant seeks to obtain a new court-appointed counsel on the basis of inadequate representation, the court must permit her to explain the basis of her contention and to relate specific instances of inadequate performance. The court must appoint a new attorney if the record clearly shows the current attorney is not providing adequate representation or that the defendant and counsel have such an irreconcilable conflict that ineffective representation is likely to result. [Citations.] If the court holds an adequate hearing, its ruling is reviewed for abuse of discretion. [Citation.]" (*People v. Rodriguez* (2014) 58 Cal.4th 587, 623.)

The Supreme Court has explained that "the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court," that "a defendant has no absolute right to more

---

**14** Counsel also said that he had previously sent defendant discovery in the case and that defendant had sent the discovery to people in another state. For that reason, counsel was "hesitant" but nonetheless spent hours making a copy of all the discovery and sending it to defendant.

than one appointed attorney," and that a trial court is not bound to accede to a request for substitute counsel unless the defendant makes a " ' "sufficient showing ... that the right to the assistance of counsel would be substantially impaired" ' " if the original attorney continued to represent the defendant." (*People v. Sanchez* (2011) 53 Cal.4th 80, 87.)

B. Analysis

Counsel's purported failure to transmit paperwork to defendant does not warrant the granting of a *Marsden* motion. Counsel said he *did* copy and send the paperwork though, for some unknown reason, defendant did not receive it. The trial court was entitled to credit counsel's representations. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1207; see also, e.g., *People v. Perez* (1992) 4 Cal.App.4th 893, 904–905 [reviewing court considered implied findings on *Marsden* motion].) Counsel's account of the paperwork issue, if credited, shows there was no irreconcilable conflict or deficient representation.

And "[a]s for defendant's complaint that counsel rarely visited him, such an allegation does not justify substitution of counsel." (*People v. Myles*, *supra*, 53 Cal.4th at p. 1208.)

Finally, defendant claims the court did not adequately inquire into defendant's allegation that counsel told him to "sit the f**k down." It is true that "[i]f the defendant states facts sufficient to raise a question about counsel's effectiveness, the court must question counsel as necessary to ascertain their veracity." (*People v. Eastman* (2007) 146 Cal.App.4th 688, 695, abrogated on another point in *People v. Sanchez* (2011) 53 Cal.4th 80, 90, fn. 3.) But even if the court erred in failing to question counsel concerning the alleged comment, we conclude any such error was harmless beyond a reasonable doubt.

Even when a defendant is denied a *Marsden* hearing altogether, prejudice must be shown to warrant reversal. (See *People v. Washington* (1994) 27 Cal.App.4th 940. 944; see also *People v. Chavez* (1980) 26 Cal.3d 334, 348–349.) After defendant's *Marsden* motion was denied, a jury trial was held and a mistrial declared. Ahead of the second trial, defendant did not make or renew his *Marsden* motion. This fact indicates that any

13.

conflict evidenced by the earlier alleged comment by counsel was not irreconcilable. (See *People v. Myles*, *supra*, 53 Cal.4th at pp. 1207–1208.)

**III.    Defendant's Ineffective Assistance of Counsel Claim Lacks Merit[15]\***

A.    Background

Detective Zaragoza interrogated defendant on January 13, 2011.  Audio of the interrogation was admitted into evidence.

Defendant contends his trial counsel was ineffective for failing to seek redaction of comments and questions posed by detectives which suggested defendant had a legal obligation to prove his innocence.

Defendant relies on the following portions of the interrogation in support of his claim:

> "Det. Torres:      If you didn't shoot him, were you there when he got shot?
>
> "[Defendant]:      No, man, I'm telling you, I wasn't there that day that he got shot, okay, I heard that he got shot, because dudes known in town okay, my grandpa knows the dude … I found, right away, found the next day that he got shot…"
>
> "Det. Zaragoza:      Well, you told me that the following day you heard that Al Pini got shot.
>
> "[Defendant]:      Yeah.
>
> "Det. Zaragoza:      Okay…
>
> "[Defendant]:      … On the phone, I don't know by my grandpa.

---

**15** Audio recordings of defendant's interrogation were admitted at trial as prosecution exhibits 20 and 21.  A written transcript of the interrogation was also provided to the jury before the recordings were played, but the transcript was not admitted as evidence.  On appeal, both parties rely on the written transcript.  We will do the same.

\* See footnote, *ante*, page 1.

"Det. Zaragoza:    Okay, and they, grandpa went in the hospital to go visit him and that people were blaming you.

"[Defendant]:    … Yeah.

"Det. Zaragoza:    And that people were blaming you, okay?  Why couldn't you pick up the phone and say hey, you know, Sheriff's Department…

"[Defendant]:    … I called you yesterday, I wanted to know what you wanted, I would have, ok, I mean, I would, if you would of talked to me yesterday, I would have had you come by the house, I wasn't gonna try and hide, I'm not, cause I know what I did and what I didn't do.

"Det. Zaragoza:    Okay, well then that's, that's not, you are missing the point. On Saturday he gets shot, on Sunday you learn, uh, that he is in the hospital, you learn that people are blaming you, that was last month on the fourth and on the fifth.  Why didn't you pick up the phone and say hey, I want to clear my name, people are blaming me…

"[Defendant]:    … I wish I would have man, I could of…

"Det. Zaragoza:    … Well then why didn't you?

"[Defendant]:    Because man, I didn't, f**k bro, I didn't f**king, think, okay, I'm going to call the police, saying like I did it man, I didn't think, I didn't think like that, okay?  And I wish I would have now that you're telling me, I wish I would of, but I didn't think that way, okay, when I heard like, man."

"Det. Zaragoza:    Hey Eric, let me tell you this, if it was me on that chair, if it was me that somebody was accusing that I shot someone, right away I would stand up and say hey, it wasn't me, I'm here…

"[Defendant]:    … I'm telling you…

"Det. Zaragoza:    … This is where I was at, I was at my girlfriend's house, she can confirm that I was there all night long, we watched this movie, we watched that movie, 'cause Eric, you're not a dumb kid, okay, you know where you were that Saturday, you know what you did that Saturday."

"Det. Torres:    If I had, if, if it was me, and somebody told me a day after the shooting that so and so got shot and looked like this, and they, they think it's me, I would have said, now they're thinking it's me,

15.

you remember we didn't do nothing we were out here, we were doing this, we were doing that, that's the first thing I would have remembered, I would have remembered that day like this.  I wouldn't have been that [*sic*] you don't remember like you're saying you don't.

"[Defendant]:      Well like bro, something like that, when you know, when you know you didn't do nothing wrong, you don't pay attention to shit like that.

"Det. Torres:      Right, that, that, that's my point…

"[Defendant]:      … You know, I don't…

"Det. Torres:      … I would have told my, my ole' lady, I would have said, you know what…

"[Defendant]:      … Like when you know you didn't do nothing wrong bro…

"Det. Torres:      …(unintelligible) we were here, we were there, and they're saying we did this, or that I did this."

B.      Standard for Ineffective Assistance of Counsel Claims

" ' "In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  [Citations.]" ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653.)

" '[A]n appellate court's ability to determine from the record whether an attorney has provided constitutionally deficient legal representation is in the usual case severely hampered by the absence of an explanation of an attorney's strategy.'  [Citation.]  For this reason, we long ago adopted the rule that " '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.  [Citations.]' " [Citations.]" (*Ibid.*)

16.

C.      Analysis

Here, the record does not show why counsel did not seek redaction of defendant's interrogation, nor was counsel asked. Consequently, " 'unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*People v. Johnson*, *supra*, 62 Cal.4th at p. 653.)  Here, there is a potentially satisfactory explanation:  counsel may have wanted the jury to hear defendant's denial of involvement in the crime. Throughout the interrogation exchanges cited by defendant, he consistently denied involvement in the crime.  Defense counsel could have reasonably wanted to have the jury learn that defendant had repeatedly denied involvement in an interrogation setting. And in order to get defendant's interrogation responses into evidence, the detectives' surrounding comments and questions would also need to be admitted.  (See Evid. Code, § 356.)  Counsel is not ineffective for failing to pursue meritless objections.  (See *People v. Lucero* (2000) 23 Cal.4th 692, 732.)  Because there is a satisfactory explanation for choosing not to seek redaction, we must reject defendant's claims.

D.      Additional Questions Posed by Detective Zaragoza

Defendant also claims counsel was ineffective for failing to redact the following questions posed by Detective Zaragoza:

> "Det. Zaragoza:      Okay, um, well, I want you to try to prove your innocence okay?  And, uh, the only way you could do that, because you have so many people pointing you out is, if, um, you know, we could eliminate you based on the evidence okay?"

Defendant argues that "[t]he evil of permitting the statements of the interrogating detectives was the repeated recitation by [Detective] Zaragoza of his constitutionally incorrect view of the law:  that Mr. Reyes needed to prove his innocence and to come forward with alibi evidence."  But Zaragoza was not expressing a "view of the law" at all. Zaragoza simply said he "want[ed]" defendant to try to prove his innocence during the interrogation.  This is a reasonable desire for a homicide detective, and is not equivalent to saying defendant was *legally obligated* to prove his innocence *at trial*.

17.

And even in the unlikely scenario that the jury took Detective Zaragoza's comments during the interrogation to be an explanation of the burden of proof applicable at trial, their misconception would have been dispelled by the jury instructions. The court told the jury that defendant was "presumed to be innocent," and that the People were required to "prove a defendant guilty beyond a reasonable doubt." The court also instructed the jury that "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt he is entitled to an acquittal and you must find him not guilty." The jury was further told that defendant may refuse to testify and "rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt." Given the low likelihood of misinterpretation of Zaragoza's comment by the jury, and the clarity of the jury instructions, we conclude the purported "failure" to seek redaction of Zaragoza's comment was not prejudicial.

## IV.    By Failing to Object Below, Defendant Forfeited his Claim that the Prosecutor Committed Misconduct During Argument*

### A.    Background

Defendant argues the prosecutor committed misconduct during closing argument. Defendant claims the prosecutor "unfairly and improperly argued that Mr. Reyes had a duty to document his alibi the moment he heard that someone might have been accusing him of shooting Efren and that his failure to do so meant he didn't have an alibi or a defense." We conclude this contention was forfeited by defendant's failure to object at trial.

During rebuttal, the prosecutor asked rhetorically, "How could someone who heard they shot someone that they are being blamed for shooting someone on a particular day not know where they were?"

During closing argument, the prosecutor argued:

---

\* See footnote, *ante*, page 1.

18.

"Let's talk about [defendant's] statement. No, he didn't confess, that would have been surprising. Most people who kill people don't. It is, I mean it would probably be unusual. But you know this in the statement, again you will get this and can listen to it if you want to.

"Very early on in the interview he says I was out of town on December 4th, 2010. Then he starts the denial. I don't know where I was. I don't know where I was. Doesn't admit I can speak Spanish. But during the interview kind of lengthy interview towards the end the truth started coming out.

"I heard rumors that someone was shot. Oh, then I heard it was Efren. I noticed that really well. Efren didn't know him well, you heard Efren say I don't know this guy. All right? Then he heard Efren got shot. At one point he says, ask him who did it. Yeah, he said he did, Efren said you shot him. Then he admits he knew the next day people were blaming him and he did nothing about it.

"Says my grandpa knows the dude, my grandpa went to visit him in Fresno. Okay, that is how I know he got shot bro, yeah. I found out right away, found out the next day he got shot. He knows the next day, December 5th.

"And then when the officer started asking why didn't you stop and do something? Why don't you at least remember the day? Why don't you call up your grandpa? Why don't you tell your girlfriend, boy, I am sure glad we were here at this store because every one is saying I shot this man and I didn't – I should call the police station and say I didn't soot any one, I was here. Let's talk about this.

"He says like I shrugged that shit off basically. I don't pay attention to that. Strange reaction to hearing that people think you shot someone. He says nothing to the sheriff's office, nothing to the people at the mobile home, nothing to Sheryl.

"He doesn't go back and say, hey Nazario, I didn't do it man, remember? It wasn't me. You know me. Go to visit Efren. Dude, I know you, we, Al Pini right. I didn't do it. Let's talk about that. I want to make sure you don't think these terrible rumors, no.

"He knew after the day of the shooting, he said people said he did it. He still didn't remember where he was. He says there is nothing significant about that Saturday other than he knew the entire, he knew the rumors of the town were saying he shot a man."

19.

Later, the prosecutor paraphrased defendant as having said, "I know I thought someone thought I shot someone, I just decided not to do anything about it."

There was no objection to these arguments posed by the prosecutor.[16]

B.      Forfeiture

"When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection.  Otherwise no claim is preserved for appeal.  [Citation.]  [¶]  Defendant made no objection to the prosecutor's remarks and thus has waived his claim.  His appeal is foreclosed on that basis." (*People v. Morales* (2001) 25 Cal.4th 34, 43–44.)

**V.      Under Supreme Court Precedent, Defendant was Not Improperly Subjected to Multiple Punishments for Inflicting GBI on Efren**

In counts 7, 8, and 9, defendant was convicted of assaulting Nazario, Jose, and Ignacio, respectively.  Each of those counts had a great bodily injury enhancement (§ 12022.7, subd. (a)) based on the injury to Efren.  Defendant claims that two of the three great bodily injury enhancements attached to counts 7, 8, and 9 should have been stayed under section 654.  The Attorney General contends that because there were multiple victims/intents with respect to the underlying assault counts, the attached GBI enhancements need not be stayed under section 654.

A.      Law

Section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law[17] shall be punished under the provision that provides for

_____

[16] Defendant requests that we address the issue even in the absence of a trial objection to foreclose a future ineffective assistance of counsel claim in a collateral proceeding.  We decline to do so.  (*People v. Mayfield* (1993) 5 Cal.4th 142, 192.)

[17] Under its plain terms, section 654 would not apply here because the great bodily injury enhancements were not imposed under "different provisions of law."  (§ 654, subd. (a).)  Neither party discussed this issue, so we requested supplemental briefing.

the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd.(a).)

Plainly stated, section 654 "prohibits multiple punishment for the same act or omission."  (*Correa*, *supra*, 54 Cal.4th at p. 337, internal quotations omitted.)  For example, if a convicted felon commits the single act of possessing a concealed weapon, he cannot be punished for both possession of a firearm by a felon and possession of a concealed weapon.  (See generally *People v. Jones* (2012) 54 Cal.4th 350.)

B.  Section 654 and Enhancements

The section 654 analysis can be become more difficult when enhancements are at issue.  "[E]nhancements are different from substantive crimes" in that they often "focus on *aspects* of the criminal act that are not always present and warrant additional punishment."  (*People v. Ahmed* (2011) 53 Cal.4th 156, 163 (*Ahmed*), fn. omitted, original italics.)  This difference "affects how section 654 applies to enhancements." (*Ibid.*, italics omitted.)

Consider the example of a defendant who commits the single act of shooting someone, resulting in great bodily injury.  (See, e.g., *Ahmed*, *supra*, 53 Cal.4th at p. 159.) The defendant has committed assault with a firearm, and is also subject to sentence for enhancements for personally using a firearm (§ 12022.53, subd. (a)) and personally

---

In *Neal v. State of California* (1960) 55 Cal.2d 11, the Supreme Court said that "[a]lthough section 654 does not expressly preclude double punishment when an act gives rise to more than one violation of the same Penal Code section … it is settled that the basic principle it enunciates precludes double punishment in such cases also."  (*Id.* at p. 18, fn. 1.)  In *People v. Correa* (2012) 54 Cal.4th 331 (*Correa*), the Supreme Court acknowledged *Neal*'s observation was "an incorrect statement of law" and held that "section 654 does not bar multiple punishment for violations of the same provision of law."  (*Correa*, *supra*, at pp. 338, 344.)  However, the Supreme Court held that under the due process clause, the new rule announced in *Correa* could only be applied prospectively.  (*Id.* at pp. 344–345.)  Both parties agree that *Correa* cannot be applied here because defendant's crimes occurred in 2010, before *Correa* was decided.

21.

inflicting great bodily injury (§ 12022.7).  In that situation, the assault and each of the sentence enhancements are based on the same act: the shooting.  Which of the three may be punished under section 654?

The law is clear that punishment for the assault and *one* of the enhancements is permitted even though they are both based on the same act.  (*Ahmed*, *supra*, 53 Cal.4th at p. 164.)  "If section 654 barred *any* additional punishment for a single criminal act, then no enhancement at all would be permitted, a result obviously inconsistent with the function of sentence enhancements."  (*Ibid.*)

However, *both* enhancements can only be simultaneously punished under section 654 if they concern different "aspects" of the criminal act of shooting.  (*Ahmed*, *supra*, 53 Cal.4th at p. 164.)[18]  Because personal firearm use and infliction of great bodily injury are different "aspects" of the criminal act of assault with a firearm, section 654 would presumably permit punishment for both enhancements.[19]

C.      Multiple Victim Exception to Section 654

The Supreme Court has created several extrastatutory exceptions to section 654.  One such exception arises "when a defendant "commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons," his greater culpability precludes application of section 654.' "  (*People v. McFarland* (1989) 47 Cal.3d 798, 803.)[20]  For example, if "a defendant, in a single incident, commits

---

[18] However, while section 654 itself may not permit multiple punishment of two enhancements, the particular enhancement statutes at issue in a particular case may override section 654.  (See, e.g., *Ahmed*, *supra*, 53 Cal.4th at pp. 164–168.)

[19] *Ahmed* itself did not reach this issue because it concluded the relevant enhancement statutes permitted punishment for both enhancements notwithstanding section 654.  (See *Ahmed*, *supra*, 53 Cal.4th at pp. 164–168.)

[20] Though this judicial exception to section 654 is not expressed in the text of the statute, we are bound to follow it.  (See *People v. Jones*, *supra*, 54 Cal.4th at p. 362 ["despite no explicit reference to victims in section 654, we held that a single act can be punished more than once if it impacts *multiple victims*"].)

22.

vehicular manslaughter as to one victim … and drunk driving resulting in injury to a separate victim" (*id.* at p. 803), he may be properly subjected to multiple punishments for the injuries "that result[] from the same incident." (*Id.* at p. 804, fn. omitted.)[21]

D.    Issue Presented

The most difficult issue presented in this case arises at the intersection of the two areas of law discussed above:  the application of section 654 to enhancements and the multiple victim exception to section 654.  Specifically, we must determine which "act" to consider in our section 654 analysis.

If the relevant acts for section 654 purposes are the assaults (i.e., pointing the gun at Ignacio, Nazario, and Jose), then the multiple victim exception clearly applies.  If, however, the relevant act is the infliction of great bodily injury on Efren, then the multiple victim exception would not apply.  As explained in detail below, we conclude that under *Oates, supra*, 32 Cal.4th 1048, the relevant acts are those on which the underlying substantive offenses (i.e., the assaults) are based.  Because there were multiple victims of those acts, the multiple victim exception applies and multiple punishment is permitted.

E.    Analysis

In *Oates*, the defendant fired into a group of five people.  (*Oates*, *supra*, 32 Cal.4th at p. 1053.)  A single victim was hit, necessitating amputation of his leg.  Defendant was charged and convicted of five counts of attempted premeditated murder.  Two of the attempted premeditated murder counts[22] had section 12022.53, subdivision (d)

---

[21] "Assault is recognized as a crime of violence in this context." (*People v. Hopkins* (1985) 167 Cal.App.3d 110, 116, disapproved on other grounds by *People v. Coronado* (1995) 12 Cal.4th 145, 159.)

[22] One of the attempted murder counts enhanced by section 12022.53, subdivision (d) was based on the victim that was actually hit by the bullet. (*Oates*, *supra*, 32 Cal.4th at p. 1053 [count 1 was the attempted murder of Barrera, the victim hit by the bullet].)  The other attempted murder count enhanced pursuant to section 12022.53,

23.

enhancements attached, which apply when a defendant "personally and intentionally discharges a firearm and proximately causes great bodily injury…." (§ 12022.53, subd. (d).) The trial court stayed one of the two section 12022.53, subdivision (d) enhancements under section 654. The Court of Appeal also "agreed with defendant that section 654 precludes imposition of *two* subdivision (d) enhancements" based on a single injury. (*Oates*, *supra*, 32 Cal.4th at p. 1054, original italics.) The People sought Supreme Court review of the lower court's ruling on the section 654 issue. (*Ibid*.)

The Supreme Court reversed and concluded the defendant could be properly punished more than once for the single great bodily injury. (*Oates*, *supra*, 32 Cal.4th at pp. 1062–1069.) The Supreme Court held:

> "[W]e conclude that section 654 does not preclude imposition of multiple subdivision (d) enhancements based on the single injury to [the victim]. Under the 'multiple victim' exception to section 654, defendant may be punished for each of the attempted murder offenses he committed when he fired at the [] group. The subdivision (d) enhancements 'simply follow from' his convictions on those 'substantive offenses.' [Citation.] They 'do not constitute separate crimes or offenses, but simply are the basis for the imposition of additional punishment for the underlying substantive offense.' " (*Id.* at p. 1066.)

We find *Oates* to be dispositive. In *Oates*, the Supreme Court reasoned that multiple punishment of the enhancements was permitted because the multiple victim exception applied to the underlying attempted murders and the enhancements simply followed from those attempted murders. (*Oates*, *supra*, 32 Cal.4th at p. 1066.) Similarly here, defendant could be punished for each assault because multiple victims were involved. Since the several GBI enhancements "simply follow from" the convictions of these "substantive offenses" (*ibid.*), they may be simultaneously punished.

---

subdivision (d) pertained to a victim who was not hit by a bullet. (See *Oates*, *supra*, at pp. 1053–1054 [count 5 was the attempted murder of Castrejon].)

24.

**DISPOSITION**

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
KANE, J.

25.

Poochigian, J., concurring.

I write separately to offer additional thoughts on defendant's claim under Penal Code section 654.**1**  Though the judgment must be affirmed, I also note that this is not the result I would reach absent *People v. Oates* (2004) 32 Cal.4th 1048 (*Oates*).  (See, e.g., *People v. Calles* (2012) 209 Cal.App.4th 1200, 1218–1224.)

**A.**     ***Oates***

In the *Oates* decision, discussed at length in the court's opinion above, the Supreme Court held:

> "[W]e conclude that section 654 does not preclude imposition of multiple subdivision (d) enhancements based on the single injury to [the victim].  Under the 'multiple victim' exception to section 654, defendant may be punished for each of the attempted murder offenses he committed when he fired at the [] group.  The subdivision (d) enhancements 'simply follow from' his convictions on those 'substantive offenses.'  [Citation.]  They 'do not constitute separate crimes or offenses, but simply are the basis for the imposition of additional punishment for the underlying substantive offense.  [Citation.]' " (*Oates*, *supra*, 32 Cal.4th at p. 1066.)

Though *Oates*'s facts are not identical to those of the present case,**2** I believe a faithful application of its holding and reasoning requires affirmance here.  I understand the holding quoted above to mean that when a court is determining whether the multiple victim exception applies to two or more enhancements, we are to look to the act(s) constituting the substantive offense, *not* to the act(s) underlying the enhancement.  Here, the acts constituting the substantive offenses (i.e., assaults), were the acts of pointing the gun at or near each of the assault victims.  Because there were multiple victims of these acts, the multiple victim exception applies not only to the assaults but also to any enhancements thereof (e.g., the GBI enhancements).  And since the multiple victim

---

**1** Future statutory references are to the Penal Code.

**2** For example, in *Oates*, the shots were fired "at the group." (*Oates*, *supra*, 32 Cal.4th at p. 1053.)  Here, in contrast, the great bodily injury (GBI)-inflicting shot was fired at a specific individual (i.e., Efren).

exception applies to the enhancements, section 654 does not preclude simultaneous punishment of all the GBI enhancements under *Oates*.

## B.     A Different Approach

While we find the reasoning of *Oates* controlling, I wonder whether its application leads to the wrong outcome in this case. In my view, the relevant "act or omission" on review of a section 654 claim is the one that defendant asserts has been improperly subjected to multiple punishment. (See § 654, subd. (a) [applies to act or omission "punishable" by statute].) In this case, defendant is not raising a section 654 challenge to the multiple punishment of the assaults on Ignacio, Nazario, and Jose.[3] Instead, he is challenging the multiple punishment he received for his singular infliction of great bodily injury on Efren.[4] Thus, with respect to defendant's claim, the "act or omission" that is "punishable" (§ 654, subd. (a)) by the GBI enhancements is the act of shooting Efren (not the acts of assaulting the other three individuals).[5]

---

[3] And rightly so, because each of those assaults was effected by a separate physical act and involved multiple victims.

[4] Efren was shot several times. Of course, the firing of each shot is a separate physical act. But the record does not indicate that each GBI enhancement was based on a different shot fired at Efren. In closing argument, the prosecutor did not distinguish between the four shots as a basis for the several GBI enhancements, saying: "[B]asically we have to prove that in addition to the 2 uses of the firearm did he cause GBI? Shot 4 times, in the hospital for 7 days." (Cf. *People v. Jones* (2012) 54 Cal.4th 350, 359 [when determining whether verdicts are based on the same act, court looks to prosecutor's jury argument].) Moreover, the Attorney General's briefing does not defend the imposition of multiple punishment on that basis.

[5] Of course, sometimes the exact same act gives rise to both the substantive crime and its enhancement. Indeed, that is how enhancements usually work: they "do not define criminal acts; rather, they increase the punishment for those acts. They focus on *aspects* of the criminal act that are not always present and that warrant additional punishment." (*People v. Ahmed* (2011) 53 Cal.4th 156, 163, original italics, fn. omitted.) But that is not the case here, where the enhancement is punishing a criminal act (i.e., inflicting GBI on Efren) that is *not* the basis of the underlying crimes (i.e., the assaults on Nazario, Ignacio and Jose). In other words, the enhancement here is not merely

## C.     *People v. Palacios*

In *People v. Palacios* (2007) 41 Cal.4th 720 (*Palacios*), the Supreme Court considered whether section 654 applies to section 12022.53 enhancements.  In concluding that section 654 does not apply, the Supreme Court pointed to language in section 12022.53 saying the enhancement was to be imposed "[n]otwithstanding any other provision of law." (§ 12022.53, subd. (d).)  The enhancement at issue in the present case, section 12022.7, has no analogous language, and *Palacios* is distinguishable on that basis.

The *Palacios* court also discussed how subdivision (f) of section 12022.53 affected application of section 654. Section 654 calls for an analysis of individual *acts*. (*Palacios*, *supra*, 41 Cal.4th at p. 732.)  In contrast, section 12022.53, subdivision (f) limits the number of enhancements to one per *crime*.  (§ 12022.53, subd. (f).)  The Supreme Court interpreted section 12022.53, subdivision (f) in light of a maxim of statutory construction providing that " ' "if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary. [Citation.]" ' " (*Palacios*, *supra*, 41 Cal.4th at p. 732.)  Consequently, the Supreme Court concluded that through subdivision (f), "the Legislature has chosen to limit enhancements based on the *crimes* committed rather than an analysis of individual *acts* as called for in section 654." (*Palacios*, *supra*, at p. 732, original italics.)

---

punishing an "aspect" of the criminal act constituting the underlying offense, it is punishing a different act altogether.

That was not the case in *Oates*.  In *Oates*, the act of shooting was the basis for both the enhancement (firearm-caused GBI) *and* the crime being enhanced (attempted murder).  That is, the "discharge [of] a firearm" (§ 12022.53, subd. (d)) that triggered the enhancement was also the act that constituted the attempted murders.

Consequently, it is possible that the *Oates* court simply was not considering the situation presented here when it employed the broad reasoning set out in the opinion.

3

*Palacios*'s analysis on that issue is relevant to the present case because section 12022.7 similarly provides that a court may not impose more than one enhancement "for the same offense." (§ 12022.7, subd. (h).) However, *Palacios*'s reasoning is distinguishable. *Palacios* observed that the difference between section 654's "act" analysis and section 12022.53's "crime" analysis supported the Supreme Court's conclusion regarding the legislative intent when "*read in conjunction with* the '[n]otwithstanding any other provision of law language' contained in section 12022.53, subdivisions (b), (c), and (d) …." (*Palacios*, *supra*, 41 Cal.4th at p. 732, italics added.) Section 12022.7 has no analogous language indicating it must be applied "notwithstanding any other provision of law."

Since the section 12022.7 enhancement does not indicate it applies "notwithstanding any other provision of law," section 654 should be applied. The relevant maxim of statutory construction provides that " ' "if exemptions are specified in a statute, we may not imply additional exemptions *unless there is a clear legislative intent to the contrary*. [Citation.]" ' " (*Palacios*, *supra*, 41 Cal.4th at p. 732, italics added.) While section 12022.7 does identify an exemption limiting the number of enhancements to one per offense, there is "clear legislative intent" indicating this is not the only exemption. And that "clear legislative intent" is embodied in section 654 itself. Together, sections 654 and 12022.7 limit GBI enhancements to no more than one per crime *and* no more than one per act. (See § 12022.7, subd. (h) [permitting only one additional prison term for the same *offense*]; § 654 [permitting only one punishment per physical *act*].) The two limitations are not inherently inconsistent. And unlike section 12022.53, there is nothing in section 12022.7 suggesting that its one enhancement per crime limitation displaces, rather than complements, the one enhancement per act limitation of section 654. As a result, I would hold that section 12022.7 enhancements

4

can be imposed no more than once per *crime* (§ 12022.7, subd. (h)) *and* can be punished no more than once per *act* (§ 654).**6**

## D. Application

To determine whether the present enhancements improperly impose multiple punishment on a single act, courts must perform "an analysis of individual *acts* as called for in section 654." (*Palacios*, *supra*, 41 Cal.4th at p. 732, original italics.) Here, the relevant "act[s] or omission[s]" under section 654 was firing the shots that inflicted GBI on Efren; not the acts of pointing the gun at or near each of the three other assault victims. (See § B., *supra*.) Since the relevant acts had a single victim (i.e., Efren), the multiple victim exception would not apply. If the multiple victim exception does not apply, then section 654 would prohibit multiple punishment because the several enhancements were all based on the same injury.

## E. Section 654's Purpose

The framework described above also furthers section 654's purpose. " 'The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence … by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person.' " (*Oates*, *supra*, 32 Cal.4th at p. 1063.) Broad application of *Oates* in all cases where multiple GBI-enhancements are imposed with respect to one victim could frustrate, rather than promote, the purpose of the multiple victim exception. Imagine a defendant fires a gun once at a crowd of 10 people, causing great bodily injury to one person. Under *Oates*, the defendant could be punished for ten GBI enhancements. But if the defendant had fired *10* shots into the same crowd, causing great bodily injury to *all 10* people, he would be punished for the same number

---

**6** Except in cases where *People v. Correa* (2012) 54 Cal.4th 331, applies.

of GBI enhancements as the defendant who only fired *once*. This result is contrary to the notion that " '[a] defendant who commits an act of violence … by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person.' "[7] (*Oates*, *supra*, 32 Cal.4th at p. 1063.)

I encourage the Supreme Court to consider whether *Oates* should apply when multiple section 12022.7 enhancements are applied to a single great bodily injury.[8]

_____
POOCHIGIAN, J.

---

[7] It seems clear that the enhancement statute itself permits such a result. (Cf. *Oates*, *supra*, 32 Cal.4th at pp. 1055–1062 [concluding § 12022.53, subd. (d) provides for multiple enhancements when one person is injured during the commission of multiple attempted murders]; see also *Oates*, *supra*, 32 Cal.4th at pp. 1069–1070 (Werdegar, J., concurring).) But I would submit that section 654 – applied to section 12022.7 enhancements – does not.

[8] While this would likely involve revisiting some of the reasoning employed in *Oates*, it would not require entirely overruling *Oates*. As noted above, the Supreme Court determined (after *Oates* was decided) that section 654 does not apply at all to section 12022.53 enhancements. (See generally *Palacios*, *supra*, 41 Cal.4th 720.) Therefore, the *result* in *Oates* – overturning a section 654 stay for multiple section 12022.53 enhancements – would remain viable under *Palacios*.